862 So.2d 79 (2003)
NATIONWIDE MUTUAL INSURANCE COMPANY, an Ohio corporation, Appellant,
v.
Dennis M. JEWELL, D.C., P.A. a/a/o Thomas Forberger, Linda Stone, and Ralph Stone, and George G. Hudson, D.C., P.A. d/b/a Hudson Chiropractic a/a/o Julie Odenweller and James Cafaro, Appellees.
Nationwide Mutual Fire Insurance Company, an Ohio corporation, Appellant,
v.
Jeff Davis, D.C., P.A. a/a/o Angela Richards, Appellee.
Nos. 2D01-5714, 2D02-871.
District Court of Appeal of Florida, Second District.
November 14, 2003.
Rehearing Denied December 19, 2003.
*80 W. Donald Cox, Charles Tyler Cone and Bruce Allen Aebel of Fowler White Boggs Banker P.A., Tampa, for Appellants.
George A. Vaka of Vaka, Larson & Johnson, P.L., Tampa, and Scott A. Schieb and Steven T. Wittmer, Sarasota, for Appellees Dennis M. Jewell, D.C., P.A. and George G. Hudson, D.C., P.A.
Eric Lee of Lee & Amtzis, P.L., Boca Raton, for Appellee Jeff Davis, D.C., P.A.
William F. Merlin, Jr., and Mary E. Kestenbaum of Gunn Merlin, P.A., Tampa, for Amicus Curiae Academy of Florida Trial Lawyers.
Gregory A. Victor of Adorno & Yoss, P.A., Miami, for Amicus Curiae ADP Integrated Medical Solutions, Inc.
Kathy J. Maus and Lola M. Swaby of Butler Burnette Pappas LLP, Tallassee, for Amicus Curiae The Alliance of American Insurers.
Jeffery M. Scott, Tallahassee, for Amicus Curiae Florida Medical Assoc.
Peter J. Valeta of Ross & Hardies, Chicago, and David B. Shelton of Rumberger, Kirk & Caldwell, Orlando, for Amicus Curiae Allstate Insurance Co. and Florida Defense Lawyers Association.
Laura M. Watson of Watson & Lentner, Ft. Lauderdale, for Amicus Curiae Florida *81 Hospital Assoc., and Florida Orthopaedic Society.
CANADY, Judge.
These consolidated cases, which are before this court pursuant to the certification of a question of great public importance under Florida Rule of Appellate Procedure 9.160, turn on the interpretation of provisions of the Florida Motor Vehicle No-Fault Law.[1] The appellants, insurers under the no-fault statute, seek review of trial court determinations that the statute prohibited them from making payment for health care services covered by personal injury protection (PIP) benefits at reduced preferred provider organization (PPO) rates to the appellee health care providers. Because we conclude that the no-fault law does not prohibit the payment of reduced PPO rates by the appellant insurers for PIP benefits, we reverse the judgments of the courts below.

I. BACKGROUND
Dennis M. Jewell, D.C., P.A., and George G. Hudson, D.C., P.A., brought separate actions against Nationwide Mutual Insurance Company in the Sarasota County Court. The Jewell and Hudson actions were consolidated for consideration by the Sarasota County Court. Jeff Davis, D.C., P.A., brought an action against Nationwide Mutual Fire Insurance Company in the Hillsborough County Court. Jewell, Hudson, and Davis, the appellee providers, each brought their actions as assignees of patients to whom they had provided treatment covered by the patients' PIP insurance. The appellee providers each claimed that the PIP insurer had failed to pay the full amounts due for covered medical services under the no-fault law. The insurers in each case had paid the appellee providers at a reduced PPO rate.
The insurers asserted a right to pay the providers at the reduced PPO rate because the appellee providers had entered "provider agreements" with at least one PPO network (namely, Beech Street Corporation or CNN), with which the insurers had entered a "payor contract." Under provider agreements, health care providers agree to provide medical services to certain patients and to accept payment for those services under a schedule of reduced PPO rates and thus, in effect, join the PPO network with which they have contracted. Insurers and employers, which are the payors for health care benefits, enter payor contracts with the PPO networks. Under those contracts, the insurers or employers make a pool of patients available to the PPO network providers and are entitled to the benefit of the reduced PPO rates which network providers have agreed to charge under the provider agreements they have entered.
In these consolidated cases there are unresolved issues concerning whether the services provided by the appellee providers were within the scope of a provider agreement that was in force at the time the services were rendered. Those issues were left unresolved because the two trial courts determined that, regardless of the contractual undertakings by the appellee providers, the appellant insurers, and the PPO networks, the insurers were statutorily barred from paying providers at PPO rates. We do not address those unresolved issues.
Both trial courts held that section 627.736(10), Florida Statutes (2000), sets forth the only circumstances under which a PIP insurer may pay medical benefits at a PPO rate. That subsection authorizes PIP insurers to enter preferred provider *82 contracts with health care providers. The subsection also authorizes the issuance of preferred provider PIP policies if the specified requirements of the subsection are met. The trial courts both concluded that the legislative authorization of contracts between PIP insurers and preferred providers and the authorization of preferred provider PIP policies by implication prohibited the utilization by PIP insurers of a PPO network where the insurers had not entered direct contracts with the preferred providers and had not issued preferred provider policies. Since the appellant insurers admittedly did not have direct contracts with the appellees and had not issued preferred provider policies as authorized by section 627.736(10), the trial courts ruled that the appellant insurers were not entitled to pay the appellee providers PPO rates.

II. CERTIFIED QUESTION
Each trial court, pursuant to the agreement of the parties, certified the following question to this court:
WHETHER [A PIP INSURER] COULD PAY [PIP] BENEFITS AT REDUCED [PPO] RATES WITHOUT OFFERING A PREFERRED PROVIDER PIP POLICY OF INSURANCE AND/OR WITHOUT COMPLYING WITH [SECTION 627.736(10), FLORIDA STATUTES].
For the reasons set forth below, we conclude that the insurers' asserted contractual basis for paying PPO rates to the appellee providers is not affected by the provisions of section 627.736(10). We therefore answer the certified question in the affirmative.

III. ANALYSIS
Section 627.736 sets forth the medical, disability, and death benefits that are required to be included in all PIP insurance policies. Under section 627.736(1)(a), benefits are required for "[e]ighty percent of all reasonable expenses for medically necessary medical ... services." Section 627.736(5)(a) provides further that
[a]ny physician ... lawfully rendering treatment to an injured person for a bodily injury covered by personal injury protection insurance may charge only a reasonable amount for the services and supplies rendered.... In no event, however, may such a charge be in excess of the amount the person ... customarily charges for like services ... in cases involving no insurance.
Section 627.736(10)which is the subject of the certified questionprovides:
An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy. The insurer shall provide each *83 policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy[ ] and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.
The appellee providers argue that this statutory provision sets forth the exclusive method for an insurer to pay PIP benefits at PPO rates and that the appellants here have impermissibly attempted to alter the statutory scheme for the payment of PIP benefits. The appellees also argue that the payment of PPO rates by the appellant insurers was improper because the policies of insurance under which the PIP benefits were payable expressly require the insurer to pay 80 percent of all reasonable and necessary expenses incurred on behalf of the insured.
The appellant insurers contend that subsection (10) does not apply to the contractual arrangements under which they paid PPO rates for PIP medical benefits. They argue that the statute pertains only to direct contracts between insurers and providers and not to circumstances where a PIP insurer contracts to become a payor in an existing PPO network. They also argue that the payments they made were not inconsistent with either the statutory or policy provisions requiring payment of reasonable and necessary expenses for covered medical services.
Although our reading of subsection (10) differs somewhat from that urged by the appellants, we agree with the conclusion that the text of neither the no-fault statute nor the PIP policies prohibits the payment of PPO rates by the appellants. There is no basis either in the specific language of subsection (10) or in any other provision of the no-fault law for concluding that the legislature prohibited the payment of PPO rates by the appellants. The requirements of subsection (10) do not cover what the appellant insurers have done; no other provision of the no-fault law or of the policies issued by the insurers prohibits what they have done.
In discussing our evaluation of the merits of the arguments presented by the parties, we will first address the proper interpretation of subsection (10). We reach two conclusions regarding subsection (10). First, subsection (10) authorizes insurers to contract with preferred providers using both direct and indirect contractual arrangements. Second, subsection (10) does not prohibit insurers that have not issued preferred provider policies from contracting to pay providers at PPO rates. After our discussion of subsection (10), we will turn to sections 627.736(1)(a) and 627.736(5)(a), the general provisions of the no-fault statute governing the payment by PIP insurers of expenses associated with covered medical services. In connection with our discussion of these medical benefit payment provisions of the no-fault statute, we will also address the parallel payments provisions of the PIP insurance policies. Our analysis of these statutory and policy provisions leads us to conclude that payment at a rate which a provider has contracted to accept is necessarily payment of a "reasonable amount." Finally, we will address the claim that the insurers have in effect altered the statutory scheme for the payment of PIP medical benefits. On this point, we conclude that the insurers have provided a potential benefit to insureds that is entirely consistent with the statutory scheme.
A. The Meaning of Subsection (10)
Subsection (10) establishes a framework under which PIP insurers are authorized to enter into preferred provider contracts with health care providers. An insurer *84 who chooses to enter such contracts is further authorized by the statute to offer prospective insureds preferred provider policies. The focus of subsection (10) is on the responsibilities to policy holders of an insurer which issues preferred provider PIP policies. An insurer that chooses to offer preferred provider policies is required also to offer nonpreferred provider policies. Under the statute, even an insured who has purchased a preferred provider policy may elect to use a nonpreferred provider and obtain the standard benefits required by the no-fault law. If an insured under a preferred provider policy elects to use a preferred provider, the insurer is authorized to provide certain benefits beyond the standard statutorily mandated PIP benefits. In such circumstances, the benefits in excess of the mandated benefits may be paid and the amount of any applicable deductible may be waived or lowered. The statute also requires that insurers provide preferred provider policy holders with a current roster of preferred providers in the county in which the insured resides at the time of the purchase of the policy. In sum, subsection (10) does two basic things: (1) it authorizes PIP insurers to enter contractual arrangements for the provision of preferred provider medical services; and (2) it authorizes PIP insurers to issue preferred provider PIP policies, subject to certain conditions and requirements.
The distinction on which the appellants rely, the difference between direct contracts by an insurer with PPO providers and contracts of an insurer with PPO networks, is not necessary to support the appellants' claim that they have not violated the statute. It is by no means clear that the authorization to "enter into contracts with licensed health care providers" for the provision of PIP health care benefits is limited to direct contracts between PIP insurers and providers. The statute does not refer specifically to direct contracts. And a legislative intent to exclude contractual arrangements other than direct contracts from the statutory authorization is by no means obvious.
A "reasonable user"[2] of the English language would understand the authorization to contract in this context as encompassing contractual arrangements in which an insurer contracts to obtain the service of providers through an intermediary PPO network. If the legislature had expressly prohibited contracts between insurers and PPO providers, it would not be reasonable to understand the prohibition as limited to direct contracts while allowing contracting through an intermediary. Cf. State ex rel. Powell v. Leon County, 133 Fla. 68, 182 So. 639, 642 (1938) ("It is fundamental and elementary that the Legislature may not do that by indirect action which it is prohibited by the Constitution to do by direct action."). Similarly, the legislature's express authorization of contracting should not be read to exclude contracting through an intermediary. The fact that the legislature has in other contexts chosen to refer to direct and indirect contracts, see §§ 627.6471, 440.134(j), Fla. Stat. (2000), does not mean that the authorization to contract with providers contained in subsection (10) should be given an unreasonably narrow construction.
Our conclusion that the authorization to contract encompasses both direct and indirect contractual arrangements does not mean that the appellant insurers have violated *85 subsection (10). Such a violation would only exist if we also concluded that the statute requires all insurers that contract to pay providers at PPO rates to issue preferred provider policies. That, however, is not the conclusion we reach.
It is unreasonable to read the provision that insurers "may negotiate and enter into contracts" with preferred providers in the first sentence of subsection (10), along with the subsequent provision permitting the issuance of preferred provider PIP policies, as prohibiting an insurer from having a contractual relationship with a preferred provider unless the insurer has issued preferred provider policies. Nothing in the text of subsection (10)or any other provision of the no-fault statutesays that an insurer may contract with preferred providers only if the insurer issues preferred provider policies. While it is true that as a practical matter a preferred provider policy may only be issued by an insurer that has contracted for preferred provider services, the converse is by no means necessarily true. The statutory authorization to contract for preferred provider services and the statutory authorization to provide the option of a preferred provider policy are separate and independentalbeit relatedauthorizations. Neither is mandatory. The mandatory provisions of subsection (10) come into play only when an insurer issues a preferred provider PIP policy.
The argument of the appellee providers thus founders on the clear language of the statutory text. The pertinent words of the statute"may negotiate and enter into contracts," and "may provide an option to an insured"are permissive, not prohibitive. There is nothing uncertain or ambiguous about the word "may." The juxtaposition of two permissive provisions ordinarily cannot be understood as establishing a prohibition. "May" plus "may" does not equal "may not."
Absent some clear warrant for doing so in the statutory context, such permissive provisions should not be read to impose an implied prohibition. Here, any warrant for adopting a prohibitive reading of the provisions is lacking. Indeed, such a reading can only be based on unwarranted assumptions concerning legislative intentassumptions that are detached from and unsupported by the words the legislature actually employed in this statute. See Fortune Ins. Co. v. Everglades Diagnostics, Inc., 721 So.2d 384, 385 (Fla. 4th DCA 1998) ("While we are required to read statutes in their entirety, we are not free to add provisions to parts of a statute under the guise of such reading."); see also Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) ("It has ... been accurately stated that courts of this state are `without power to construe an unambiguous statute in a way which would extend, modify, or limit[ ] its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.'") (quoting Am. Bankers Life Assurance Co. v. Williams, 212 So.2d 777, 778 (Fla. 1st DCA 1968) (emphasis removed)); Pub. Health Trust v. Lopez, 531 So.2d 946, 949 (Fla.1988) ("We are not permitted to attribute to the legislature an intent beyond that expressed ... or to speculate about what should have been intended.") (citations omitted). If the legislature wishes to prohibit something, it is perfectly capable of saying so. Indeed, few words are more common in the language of legislation than the phrases "may not" and "shall not."
B. The Meaning of a "Reasonable Amount" for Services Rendered
As set forth above, section 627.736(1)(a) requires PIP insurers to pay 80 percent of "all reasonable expenses" for *86 covered medical servicessubject, of course, to the $10,000 policy limits provided for in the statute. Section 627.736(5)(a) limits the charges made by providers for services rendered to PIP beneficiaries to "only a reasonable amount" for the services rendered. The key to compliance with those provisions isto state the obviousthe payment of amounts that are reasonable remuneration for the particular services provided. It is unreasonable to read those provisions of the statute and the parallel provisions of the PIP policies to require that an insurer pay a provider for services at a rate higher than the rate the provider has contractually agreed to accept in payment for such services. If a provider has agreed in a valid and enforceable contract to accept payment for services at a particular rate, that rate would necessarily be a "reasonable amount for the services ... rendered." § 627.736(5)(a). Insofar as the provisions of the no-fault law and of the PIP policies are concerned, there is simply no basis for complaining that a payment rate a provider has agreed to accept is inadequate and therefore not reasonable.
C. Compliance with the Statutory Scheme of the No-Fault Law
The appellant insurers have done nothing that is inconsistent with any provisions of the no-fault law. They have not attempted to require that any insured use a PPO provider. The appellants acknowledge that any such requirement would be impermissible under the no-fault law. (That would be true even if subsection (10) were not a part of the law.) Each insured was free to utilize whatever provider the insured wished to use.
Any contractual arrangements the insurers have made for paying certain providers at PPO rates have in no way adversely affected the services made available to the insureds under the PIP policies. If an insured used a PPO provider in a PPO network with which the appellant insurer had a contractual relationship, the only impact on the insured would be to save the insured money. Any insured using a PPO provider would have a copayment lower than the copayment that would be applicable if a non-PPO provider had been used. In addition, since each treatment provided by a PPO provider costs the insurer less than the same treatment given by a non-PPO provider, more services will be available to the insured within the $10,000 PIP policy limits provided for in section 627.736(1). The appellee providers argue that the appellant insurers have somehow undermined or altered the statutory scheme of the no-fault law. In light of the actual impact on the PIP insureds who may choose to use PPO providers, the appellees' argument rings hollow.

IV. CONFLICTING AUTHORITY
In Nationwide Mutual Fire Insurance Co. v. Central Florida Physiatrists, P.A., 851 So.2d 762, 766 (Fla. 5th DCA 2003), a case involving factual circumstances similar to those before us now, the Fifth District held that the "[insurer] was required to comply with the provisions of section 627.736(10) in order to take advantage of the option of paying reduced PPO rates for payment of PIP benefits." The court concluded that in the absence of compliance with section 627.736(10), the insurer was required "to pay the statutorily mandated 80% of the reasonable and necessary expenses incurred on behalf of its insured" rather than the reduced PPO rates. Id.
For the reasons set forth above, we disagree with the conclusion reached in Central Florida Physiatrists, and we recognize the direct conflict between our decision and the decision of the Fifth District. Accordingly, pursuant to article V, section *87 3(b)(4), Florida Constitution, and Florida Rule of Appellate Procedure 9.030(a)(2)(A)(vi), we certify that our decision is in direct conflict with the decision of the Fifth District.

V. CONCLUSION
Since we have concluded that the trial courts erred in their interpretation of the no-fault law, we reverse the judgments on appeal. Unresolved issues regarding the scope and contractual validity of the provider agreements and the payor contracts will be addressed by the trial courts on remand.
Reversed and remanded for further proceedings consistent with this opinion; certified question answered; conflict certified.
FULMER and SALCINES, JJ., Concur.
NOTES
[1] § 627.730-.7405, Fla.Stat. (2000).
[2] Frank H. Easterbrook, The Role of Original Intent in Statutory Construction, 11 Harv. J.L. & Pub. Policy 59, 65 (1988) (stating that questions of statutory interpretation should turn on how "a skilled, objectively reasonable user of words" would have understood the text of the statute).