961 So.2d 328 (2007)
ALLSTATE INSURANCE COMPANY, Petitioner,
v.
HOLY CROSS HOSPITAL, INC., etc., Respondent.
Holy Cross Hospital, Inc., et al., Petitioners,
v.
Allstate Insurance Company, Respondent.
Nos. SC05-435, SC05-545.
Supreme Court of Florida.
July 12, 2007.
*330 Richard C. Godfrey, Andrew A. Kassof, and R. Christopher Heck of Kirkland and Ellis, LLP, Chicago, IL, and Jack R. Reiter of Adorno and Yoss, LLP, Miami, FL, for Petitioner/Cross-Respondent.
George A. Vaka of Vaka, Larson, and Johnson, PL, Tampa, FL, and Laura M. Watson of Watson and Lentner, Fort Lauderdale, FL, for Respondent/Cross-Petitioner.
Peter J. Valeta of Meckler, Bulger and Tilson, LLP, Chicago, IL, on behalf of the Florida Insurance Council, Inc.; Eric Lee of Lee and Amtzis, PL, Boca Raton, FL, and Lawrence M. Kopelman of Kopelman and Blankman, Fort Lauderdale, FL, on behalf of Florida Consumer Action Network; and Laura M. Watson, Fort Lauderdale, FL, on behalf of Florida Hospital Association and Florida Orthopaedic Society, as Amicus Curiae.
PARIENTE, J.
This case arises from a dispute concerning the amount an automobile insurance company was required to pay a hospital at which its insureds received medical treatment. In Allstate Insurance Co. v. Holy Cross Hospital, Inc., 895 So.2d 1241 (Fla. 4th DCA 2005), the Fourth District Court of Appeal certified conflict with the Fifth District Court of Appeal's decision in Nationwide Mutual Fire Insurance Co. v. Central Florida Physiatrists, P.A., 851 So.2d 762 (Fla. 5th DCA 2003) (CFP).[1] The conflict issue is whether a personal injury protection (PIP) insurer must comply with the requirements of section 627.736(10), Florida Statutes (2006), in order to pay PIP benefits based on a reduced rate that a medical provider contractually agreed to accept. The Fourth District aligned itself with the Second District Court of Appeal's decision in Nationwide Mutual Insurance Co. v. Jewell, 862 So.2d 79 (Fla. 2d DCA 2003), which concluded that compliance with section 627.736(10) is not a prerequisite to the payment of PIP benefits at reduced rates that the medical provider contractually agreed to accept. Because we agree with both the Second District and the Fourth District on this issue, we approve the Fourth District's decision in Holy Cross and the Second District's decision in Jewell and disapprove of the Fifth District's decision in CFP.

FACTS AND PROCEDURAL HISTORY
Lawrence Weisner and Matthew Winik were injured in separate automobile accidents on April 12, 2001, and May 10, 2001, respectively. Weisner and Winik each had automobile insurance policies through Allstate that contained PIP benefits. Both received medical treatment on the day of their accidents at Holy Cross Hospital, Inc. (Holy Cross), which submitted the medical bills to Allstate. Although the record is silent as to how Weisner and Winik chose to receive treatment at Holy Cross, there is no evidence to suggest that they were directed to this hospital by Allstate.
Rather than remitting eighty percent of the entire bill as charged, Allstate paid eighty percent of a reduced rate. Allstate's payment at this reduced rate was predicated on separate contracts that Holy Cross and Allstate each allegedly entered into with a provider network known as Beech Street Corporation (Beech Street). *331 Allstate asserted that, based on Holy Cross's contract with Beech Street and Beech Street's contract with Allstate, the hospital agreed to provide medical services to covered insureds at reduced rates. Holy Cross insisted that because neither Weisner nor Winik had preferred provider (PPO) policies with Allstate and because Allstate had not contracted directly with any health care provider, Allstate could not take advantage of any reduced rates and was required to pay eighty percent of all reasonable medical expenses, i.e., eighty percent of the full bill as charged, as set forth in section 627.736(1)(a), Florida Statutes (2006).[2] Based on assignments from Weisner and Winik of their benefits under Allstate's policies, Holy Cross filed suit seeking declaratory judgment and damages.
The county court granted Holy Cross's motion for partial summary judgment based on the Fifth District's decision in CFP, which at that time was the only appellate court to have addressed the issue.[3] The county court also certified the following question as one of great public importance to the Fourth District: "Is an insurer required to comply with the provisions of section 627.736(10), Fla. Stat. in order to take preferred provider reductions in the payment of PIP benefits for medical services rendered to its insureds?" Holy Cross, 895 So.2d at 1242.
On appeal, the Fourth District answered the certified question in the negative, adopting the view of the Second District in Jewell. Accordingly, the Fourth District reversed the trial court's grant of summary judgment in favor of Holy Cross, remanded to the trial court for a determination of any outstanding issues concerning the contracts between Beech Street and both Holy Cross and Allstate, and certified conflict with CFP. See Holy Cross, 895 So.2d at 1244-45. We accepted jurisdiction to resolve the conflict.

ANALYSIS
The issue we decide is whether an automobile PIP insurer must comply with the requirements of section 627.736(10) in order to pay PIP benefits based on a reduced rate that a medical provider contractually agreed to accept. Because the conflict issue requires this Court to interpret provisions of the Florida Motor Vehicle No-Fault Law (No-Fault Law),[4] the standard of review is de novo. See Foundation Health v. Westside EKG Assocs., 944 So.2d 188, 193-94 (Fla.2006) (applying the de novo standard of review to questions of statutory interpretation); Aramark Unif. & Career Apparel, Inc. v. Easton, 894 So.2d 20, 23 (Fla.2004) (same).
In 1971, the Florida Legislature enacted the No-Fault Law. See ch. 71-252, § 1, Laws of Fla. The No-Fault Law is a comprehensive *332 statutory scheme, the purpose of which is to "provide for medical, surgical, funeral, and disability insurance benefits without regard to fault, and to require motor vehicle insurance securing such benefits." § 627.731, Fla. Stat. (2006); accord United Auto. Ins. Co. v. Rodriguez, 808 So.2d 82, 85 (Fla.2001) (stating that the intent of the No-Fault Law is "to provide a minimum level of insurance benefits without regard to fault"). The No-Fault Law mandates security that can be established by alternative means, one of which is PIP insurance. See § 627.733, Fla. Stat. (2006).
The "Required Personal Injury Protection" provision, or the PIP statute, is codified at section 627.736 and is "an integral part of the no-fault statutory scheme." Flores v. Allstate Ins. Co., 819 So.2d 740, 744 (Fla.2002). The statute requires motor vehicle insurance policies issued in Florida to provide PIP benefits for bodily injury "arising out of the ownership, maintenance, or use of a motor vehicle." § 627.736(1), Fla. Stat. (2006); accord Blish v. Atlanta Cas. Co., 736 So.2d 1151, 1153 (Fla.1999). The PIP statute is unique, in that it abolished "a traditional common-law right by limiting the recovery available to car accident victims" and in exchange, required PIP insurance that was recoverable without regard to fault. State Farm Mut. Auto. Ins. Co. v. Nichols, 932 So.2d 1067, 1077 (Fla.2006). Although recovery is restricted under this statutory scheme, this Court has held that the PIP statute is a reasonable alternative to common law tort principles in that it provides "swift and virtually automatic payment so that the injured insured may get on with his life without undue financial interruption." Id. (quoting Ivey v. Allstate Ins. Co., 774 So.2d 679, 683-84 (Fla.2000)). For purposes of determining whether insurers may pay PIP benefits based on contractually agreed-upon reduced rates, a discussion of the relevant subsections of the PIP statute is helpful.
Subsection (1) of the PIP statute outlines the coverage that PIP insurers must provide for medical, disability, and death benefits. As to medical benefits, which are the subject of this case, insurers must pay "[e]ighty percent of all reasonable expenses for medically necessary medical, surgical, X-ray, dental, and rehabilitative services, including . . . medically necessary ambulance, hospital, and nursing services." § 627.736(1)(a), Fla. Stat. (emphasis supplied). PIP insurers are required to comply with subsection (1) and cover all medically necessary medical expenses at that percentage, unless one of the specific exclusions set forth in subsection (2) applies. See § 627.736(2), Fla. Stat (2006).
Subsections (4) and (5) set forth strict guidelines for both PIP insurers and medical providers, including how and when charges must be submitted and benefits paid. See § 627.736(4)-(5), Fla. Stat (2006). For instance, subsection (5)(a) provides that any "physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for a bodily injury covered by [PIP] insurance may charge the insurer and injured party only a reasonable amount pursuant to this section. . . . In no event, however, may such a charge be in excess of the amount the person or institution customarily charges for like services." § 627.736(5)(a), Fla. Stat. In sum, these subsections detail standards for the type of PIP policies that may be issued, the percentage of the medical bills a PIP insurer is required to cover, and how the benefits under those policies must be paid.
When the PIP statute was initially enacted in 1971, it was unclear whether PIP insurers were authorized to increase the medical benefits coverage beyond the standard *333 eighty percent required by subsection (1)(a). Fla. H. Comm. on Ins., CS/HB 2089 Staff Analysis 5 (June 12, 1991). This question was resolved in 1991, when the Legislature added subsection (10), the provision at issue in this case, which for the first time authorized PIP insurers to enter into contracts with preferred providers, increase PIP medical benefits beyond the standard eighty percent, and reduce the standard PIP deductibles in certain circumstances. See ch. 91-106, § 7, Laws of Fla.
As originally enacted, the provision provided:
(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time that medical services are sought by the insured for the benefits described in this section. If the insured elects to use a provider who is not a preferred provider, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. The insurer may not require a policyholder or applicant to make any election in this regard at the time of purchase of the policy or at any time other than at the time that medical services are sought. The insurer shall provide each policyholder with a current roster of preferred providers and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.
Id. Thus, the original version of subsection (10) did not allow PIP insurers to issue PPO policies, because that would have required insureds to decide whether to participate in the PPO program at the time they purchased a policy. Rather, insureds could choose to use a preferred provider only at the time medical services were sought. If the insured used such a provider, PIP insurers could "pay medical benefits in excess of the benefits required by [statute] and may waive or lower the amount of any deductible that applies to such medical benefits." Id.
In 1992, the Legislature amended this provision, deleting the prohibition against the issuance of PPO policies and specifically authorizing such policies if the insurer complied with the requirements of the subsection. See ch. 92-318, § 84, Laws of Fla. Subsection (10), with the 1992 amendments shown in underline and strike-through, currently reads as follows:
(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met that medical services are sought by the insured for the benefits described in this section. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured *334 elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy. The insurer may not require a policyholder or applicant to make any election in this regard at the time of purchase of the policy or at any time other than at the time that medical services are sought. The insurer shall provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.
Id.
As always, legislative intent is the polestar that guides a court's inquiry under the No-Fault Law. Rodriguez, 808 So.2d at 85; Blish, 736 So.2d at 1155. Such intent is derived primarily from the language of the statute. Cason v. Florida Dep't of Mgmt. Servs., 944 So.2d 306, 312 (Fla.2006). "Where the wording of the [No-Fault] Law is clear and amenable to a logical and reasonable interpretation, a court is without power to diverge from the intent of the Legislature as expressed in the plain language. . . ." Warren v. State Farm Mut. Auto. Ins. Co., 899 So.2d 1090, 1095 (Fla.2005) (quoting Rodriguez, 808 So.2d at 85).
Holy Cross and Allstate both maintain that the language in this provision is clear and unambiguous, yet they reach completely opposite conclusions as to the statute's meaning. Holy Cross cites the Fifth District's decision in CFP to support its argument that PIP insurers must comply with the strict guidelines of subsection (10) whenever an insurer reimburses a health care provider at a reduced rate. Conversely, Allstate cites the Second District's decision in Jewell to support its contention that the requirements of subsection (10) do not regulate the contracts at issue here because the provision applies only when a PIP insurer offers a PPO policy to its insured. We agree with Allstate that neither the language of subsection (10) nor any other provision of the PIP statute provides a blanket prohibition against an insurer paying a health care provider based on a reduced rate that the provider contractually agreed to accept.
As is evident from the language of subsection (10), the 1992 amendments authorized insurers to issue PPO policies in the context of PIP insurance.[5] Subsection (10) is the sole avenue by which insurers can modify the standard PIP policy as outlined in section 627.736 and when such policies are offered, the insurers clearly must comply with the statutory mandates of subsection (10). Under subsection (10), if an insured purchases a PPO policy and chooses to use a preferred provider, then the PIP insurer may "pay medical benefits in excess of the benefits required [by statute] and may waive or lower the amount of any deductible that applies to such medical benefits." § 627.736(10), Fla. Stat. Thus, an insurer could cover medical benefits at 100% (instead of the standard 80% required *335 by subsection (1)(a)). Basically, PPO policies can provide insureds with the opportunity to obtain full coverage of their medical bills (up to 100%), and allow insurers to increase the standard $10,000 policy limit or waive the applicable deductible.
In sum, subsection (10) authorizes insurers to provide consumers with alternatives to the standard coverage options in the PIP statute. This provision allows PIP insurers to enter into contracts with preferred providers, issue PPO policies, and, most importantly, increase the "medical benefits in excess of the benefits required by this section" and "waive or lower the amount of any deductible that applies to such benefits." § 627.736(10), Fla. Stat. However, where the insurer is neither issuing PPO policies nor attempting to modify the standard PIP insurance policy as set forth in section 627.736, we conclude that there is nothing in the language of the statute that requires an insurer to comply with subsection (10).
Contrary to Holy Cross's assertion, we do not interpret the first sentence in subsection (10) as providing the only authority for an insurer to enter into contracts with healthcare providers. That sentence states that "[a]n insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as `preferred providers,' which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463." § 627.736(10), Fla. Stat. Although this sentence clearly involves contracts between PIP insurers and medical providers, the phrase "for the benefits described in this section," indicates that this sentence is part of the provision's scheme to authorize the issuance of PPO policies. In essence, it is the necessary first step that makes it possible for PIP insurers to create preferred provider networks and issue PPO policies for PIP benefits. It would be a strained reading to interpret this sentence as prohibiting insurers from entering into contracts with health care providers unless the contract is utilized for the sole purpose of issuing PPO policies. Further, absent an express prohibition against such contracts, we do not read the permissive "may" in the first sentence as precluding the types of contractual relationships that Allstate allegedly negotiated in this case.
We reject Holy Cross's argument in the alternative that a payment which is eighty percent of a contractually agreed-upon reduced rate is a per se violation of section 627.736. First, there is no provision in subsection (10) or the entire PIP statute that specifically precludes an insurer from entering into a contract with a provider to create an agreed-upon fee schedule for reduced rates. See Jewell, 862 So.2d at 83. Second, payment at a reduced rate does not violate subsection (1)(a) so long as the insurer pays "eighty percent of all reasonable expenses." § 627.736(1)(a), Fla. Stat. (emphasis supplied). What a provider customarily charges or has previously accepted are important factors for determining whether a fee is reasonable. See § 627.736(5)(a), Fla. Stat. This is especially true where the provider has agreed to accept a certain fee as reasonable payment for the services rendered. Jewell, 862 So.2d at 86. Accordingly, "[i]f a provider has agreed in a valid and enforceable contract to accept payment for services at a particular rate, that rate would necessarily be a `reasonable amount for the services . . . rendered.'" Id. (quoting § 627.736(5)(a), Fla. Stat.).
Finally, Holy Cross and its amici assert that Allstate has circumvented the statute and created its own silent PPO or managed care system with its provider network scheme, at the expense of the quality *336 of healthcare and to the detriment of its insureds. Although we recognize that these are valid concerns, there is no evidence in the record to suggest that Allstate has created a silent PPO or managed care system that forces an insured to use preferred providers, engaged in actions to the detriment of its insureds, or otherwise violated the statutory scheme.[6]

CONCLUSION
Based on the foregoing analysis, we conclude that an insurer, which neither violates the provisions of section 627.736 nor otherwise attempts to modify its responsibilities under the standard PIP policy, is not required to comply with the requirements of section 627.736(10) in order to pay PIP benefits based on a reduced rate that a medical provider contractually agreed to accept. Subsection (10) regulates insurers that issue PPO policies or otherwise attempt to amend the standard PIP benefits set forth in the PIP statute. A PIP insurer that merely enters into a contract with a preferred provider to create an agreed-upon fee schedule for medical services and does not issue PPO policies or amend the standard PIP policy requirements in section 627.736 may do so without complying with the requirements of subsection (10). In essence, the effect of such contractual agreements would be to predetermine what constitutes a "reasonable expense" for a covered service, which comports with the purpose of the PIP statute to provide "swift and virtually automatic payment" of PIP benefits. Nichols, 932 So.2d at 1077 (quoting Ivey, 774 So.2d at 683-84).
Therefore, we approve the Fourth District's decision in Holy Cross and the Second District's decision in Jewell and disapprove the Fifth District's decision in CFP to the extent that it conflicts with this opinion.[7] Because the trial court and Fourth District expressly declined to address any issues relating to the contracts between Beech Street and both Holy Cross and Allstate, any outstanding issues concerning the contracts should be addressed on remand.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, QUINCE, and BELL, JJ., concur.
CANTERO, J., recused.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
[2] The parties disagree as to the substance of, and even the existence of, these contracts. Holy Cross contends that, even if the contracts exist, they do not cover payment of PIP benefits. However, because Holy Cross argued that Allstate had violated the statute notwithstanding the existence of these agreements, the trial court and the Fourth District assumed the contracts existed and reached the statutory construction issue. Accordingly, our analysis of this case assumes the existence of enforceable contracts by which Holy Cross agreed to accept PPO rates from Allstate for any of its insureds that received treatment covered by their PIP policies. Any issues regarding the contracts may be addressed on remand.
[3] The county court awarded damages in the amount of $74.95 and $349.23 (including prejudgment interest) on the Winik and Weisner claims, respectively.
[4] Section 627.730, Florida Statutes (2006), states that "[s]ections 627.730-627.7405 may be cited and known as the `Florida Motor Vehicle No-Fault Law.'"
[5] PPO policies are in essence a managed care option to insurance, in which insurers "strongly encourage[] [policyholders] to choose a `preferred' provider . . . [through] economic incentives such as no copayments, lower deductibles, and higher coverage." H. Ward Classen, Provider-Based Preferred Provider Organizations: A Viable Alternative Under Present Federal Antitrust Policies?, 66 N.C. L.Rev. 253, 255 (1988).
[6] At oral argument, Holy Cross argued that the Allstate insureds may still be liable to Holy Cross for 20% of the full amount billed rather than 20% of the reduced rates. Allstate counters that the insured will benefit by having to pay only 20% of the reduced rate. For the purposes of this opinion, we are assuming that the maximum liability of the insureds would be 20% of the reduced rate.
[7] We decline to address any of the affirmative defenses that the Fourth District ruled had been waived by Allstate. Holy Cross, 895 So.2d at 1245.