[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11083
_____

D.C. Docket No. 8:15-cv-02920-JSM-EAJ


ANTONY LEE TURBEVILLE,

Plaintiff-Appellant,


versus

FINANCIAL INDUSTRY REGULATORY AUTHORITY,
JOHN DOES,
JOHN WILLIAM MCCALL,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 1, 2017)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and REEVES,[*] District Judge.

TJOFLAT, Circuit Judge:

_____

[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Before us is the District Court's dismissal of Antony Turbeville's complaint against the Financial Industry Regulatory Authority ("FINRA") and its denial of Turbeville's motion to remand the case to Florida state court.  We affirm both.

## I.

## A.

The Securities Exchange Act of 1934 ("Exchange Act") provides that persons who wish to use any instrumentality of interstate commerce to transact in securities must join an association of brokers and dealers registered as a national securities association.  15 U.S.C. § 78o(a)(1), (b)(1).[1]  In turn, the Exchange Act requires registered national securities associations to establish membership and conduct rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest . . . ."  *Id.* § 78o-3(b)(6).

When member brokers or dealers violate the rules of a national securities association or any provision of the Exchange Act, the association can—indeed, must—levy sanctions that carry the force of federal law.  *Id.* § 78o-3(b)(7) (requiring national securities associations to "appropriately discipline[]" members

---

[1] Alternatively, a person may transact in securities if he joins a national securities exchange, but he must transact exclusively on that exchange.  15 U.S.C. § 78o(b)(1)(B).

for violating "the rules of the association" or "any provision of" the Exchange Act "by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction"). In this way, the Exchange Act vests registered national securities associations with a prominent role in the administration and enforcement of federal securities law. Fittingly, the Exchange Act refers to these associations as "self-regulatory organizations" ("SROs"). *Id.* § 78s. Before taking effect, all rules proposed by national securities associations must be reviewed by the Securities and Exchange Commission ("SEC") to ensure they are "consistent with the requirements of" the Exchange Act and may be approved by the SEC only after public notice and comment. *Id.* § 78s(b)(1).

FINRA, a private, non-profit Delaware corporation, is one of those national securities associations and a registered SRO.[2] FINRA oversees and regulates securities firms who join its membership, individuals who work for those firms, and individuals associated with those firms. Securities brokers who wish to join a FINRA-affiliated firm must pass FINRA-administered examinations and comport their professional conduct with the rules, regulations, and standards FINRA

---

[2] FINRA, previously known as the National Association of Securities Dealers, has since 1939 been the only registered national securities association in the United States. Exemption for Certain Exchange Members, Exchange Act Release No. 74,581, 111 SEC Docket 680 (Mar. 25, 2015).

promulgates.  When its member brokers or associated persons violate FINRA's

rules, FINRA disciplines them pursuant to the Exchange Act's requirements.

B.

FINRA's disciplinary process is governed by the FINRA Code of Procedure,

a series of internal rules that set forth the disciplinary procedures that apply—and

the due-process protections afforded—to members charged with breaking the rules.

In satisfaction of the Exchange Act's requirement, the SEC approved the FINRA

Code of Procedure.  *Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569,

571–72 (2d Cir. 2011).

The FINRA Code of Procedure sets forth a multi-layered hearing and

appeals process that governs disciplinary actions against FINRA-affiliated brokers

and dealers.[3]  Once FINRA formally charges a broker with a violation by filing a

complaint, a FINRA hearing panel conducts a full hearing to determine whether

the individual violated FINRA regulations, and, if so, imposes sanctions.  *See*

FINRA Rule 9200 (setting forth FINRA's disciplinary procedures).  The individual

may then appeal the hearing panel's finding and punishment to FINRA's appeals

---

[3] These procedures are designed to conform to the Exchange Act's requirement that SROs' disciplinary procedures

provide a fair procedure for the disciplining of members and persons associated with members, the denial of membership to any person seeking membership therein, the barring of any person from becoming associated with a member thereof, and the prohibition or limitation by the association of any person with respect to access to services offered by the association or a member thereof.

15 U.S.C. § 78o-3(b)(8).

4

board, the National Adjudicatory Council ("NAC").  FINRA Rule 9311(a).  After that, a broker may, as of right, seek *de novo* review of the NAC's decisions in the SEC.  15 U.S.C. § 78s(d)(2).  Finally, the broker may appeal the SEC's decision to a federal court of appeals—again, as of right.  *Id.* § 78y(a)(1).

Prior to formally charging a broker with a violation and instituting formal disciplinary proceedings, FINRA retains discretion to issue to the broker a "Wells notice," a communication informing the individual that FINRA believes it has grounds to institute a disciplinary action and inviting him to respond and try to convince FINRA not to institute formal proceedings.  *See* FINRA Rule 8210(a)(1); FINRA Regulatory Notice 09-17 at 3 (Mar. 2009).  These notices become a part of the public record: FINRA's SEC-approved rules require it to disclose communications like Wells notices in response to public inquiries about FINRA-affiliated brokers or firms.  *See* FINRA Rule 8312(a), (b)(2)(A) (requiring FINRA, "[i]n response to a written inquiry, electronic inquiry, or telephonic inquiry via a toll-free telephone listing," to release "information regarding a current or former FINRA member," including Wells notices, which are required by the "U5" and "U6" forms listed in the Rule).  Those rules are designed to satisfy the Exchange Act's requirement that SROs "establish and maintain a . . . readily accessible electronic or other process, to receive and promptly respond to inquiries regarding . . . registration information on its members and their associated persons."  15

U.S.C. § 78o-3(i)(1).  FINRA makes these disclosures through its "BrokerCheck" program, an online database that contains a report on each currently and formerly registered broker.  BrokerCheck reports are available to the public.

FINRA's rules set forth an administrative-review proceeding through which a broker may "dispute the accuracy of" information disclosed in his BrokerCheck report by filing written notice stating the grounds for his dispute and submitting supporting documentation "identifying the alleged inaccurate factual information and explaining the reason that such information is allegedly inaccurate."  *See* FINRA Rule 8312(e)(1)(B).  Once the broker has done so and if FINRA determines that the "dispute of factual information is eligible for investigation," FINRA will "add a general notation to the eligible party's BrokerCheck report stating that the eligible party has disputed certain information included in the report."  *Id.* § (e)(2)(B).  Once it completes its investigation, FINRA will then issue a written finding setting forth its determination as to the accuracy of the information contested, and it will update the broker's BrokerCheck report accordingly.  *Id.* § (e)(3)(A)–(B).  Unlike the hearing panel determination in the formal disciplinary process, this initial finding is the end of the road: "A determination by FINRA, including a determination to leave unchanged or to modify or delete disputed information, is not subject to appeal."  *Id.* § (e)(3)(C).

6

C.

In 2009, FINRA filed a complaint against Antony Turbeville, a registered representative of a FINRA-affiliated broker firm. The complaint alleged that, among other things, Turbeville committed securities fraud by recommending certain types of collaterized mortgage obligations to elderly buyers who lacked the sophistication and risk tolerance necessary to make them suitable purchasers. A FINRA hearing panel found that Turbeville's conduct violated FINRA's rules, barred him from associating with any FINRA-affiliated firm, and assessed restitution and adjudication costs against him. Turbeville appealed the hearing panel's decision to the NAC, which affirmed. Turbeville then appealed to the SEC. Before the SEC reviewed his case, Turbeville withdrew his appeal, thereby letting the hearing panel's findings and punishments stand.

While Turbeville's appeal to the NAC was still pending, FINRA learned that Turbeville filed a defamation suit in Florida state court against the elderly investors who testified against him in the course of the FINRA hearing panel's proceedings.[4] Upon learning of this suit, FINRA investigated Turbeville again—this time, to determine whether he violated FINRA rules by filing a retaliatory action against his former customers in an attempt to influence ongoing FINRA disciplinary

---

[4] Turbeville voluntarily dismissed his first Florida lawsuit when the Florida court ordered him to arbitrate his claims.

7

proceedings.  FINRA's investigators determined that they had cause to institute another disciplinary proceeding on the basis of Turbeville's conduct and issued Turbeville a Wells notice.  The Wells notice said,

> ON JULY 3, 2013, FINRA MADE A PRELIMINARY DETERMINATION TO RECOMMEND THAT DISCIPLINARY ACTION BE BROUGHT AGAINST ANTONY TURBEVILLE ALLEGING HE FILED A FALSE COMPLAINT AGAINST AND ATTEMPTED TO INTIMIDATE WITNESSES IN A FINRA DISCIPLINARY ACTION, IN VIOLATION OF FINRA RULE 2010.

At the time FINRA issued the Wells notice, Turbeville no longer worked in the securities industry and was not a member of a FINRA-affiliated broker firm. The Wells notice was included in Turbeville's BrokerCheck report, which was still available to the public.  Turbeville responded to the Wells notice and disputed the investigators' findings.  Subsequently, FINRA removed the Wells notice from Turbeville's BrokerCheck report.

Then, Turbeville returned to the Florida state courts—this time suing FINRA, unnamed FINRA employees, and another individual.[5]  He sued for defamation, abuse of process, intentional interference with a prospective advantage, and conspiracy, all Florida tort actions.  Turbeville alleged that each of his claims arose from FINRA's second investigation of his suit against his former

---

[5] This individual, John William McCall, was later identified as the son of one of Turbeville's former clients.  The District Court observed that it appeared Turbeville never served process to McCall or the individual FINRA employees.

8

clients, which he claimed exceeded FINRA's authority and jurisdiction under its own internal rules.

FINRA timely removed the case to federal district court and shortly thereafter filed a motion to dismiss Turbeville's claims. Turbeville filed a motion to remand the case to the Florida state court, arguing that all of his claims were, on their face, based in Florida tort law. Contemporaneously, he opposed FINRA's motion to dismiss. The District Court construed Turbeville's suit as a challenge to FINRA's application of its own internal rules, which FINRA promulgated pursuant to its grant of regulatory authority under the federal Exchange Act. Thus, the Court concluded that a substantial federal question existed and denied Turbeville's motion to remand. In the same order, the District Court granted FINRA's motion to dismiss Turbeville's claims, concluding that FINRA had absolute immunity from liability in the exercise of its regulatory functions, and that no private right of action for damages against FINRA exists. Turbeville timely appealed.

## II.

We affirm both the District Court's denial of Turbeville's motion to remand and its decision to grant FINRA's motion to dismiss. As to the first issue, we hold that suits against SROs like FINRA for violating their internal rules "arise under" the Exchange Act of 1934 and therefore fall under the Act's grant of exclusive jurisdiction to the federal district courts. Thus, removal was proper in this case.

9

As to the second issue, we hold that no private right of action exists for SRO members and associated persons to sue SROs for violating their own internal rules. Accordingly, the District Court correctly dismissed Turbeville's claim.

## A.

The jurisdictional question turns on whether the suit "arose under" Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a).[6]  Section 27(a) grants the federal district courts exclusive jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder." *Id.*  In *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, the Supreme Court held that § 27(a) "confer[s] exclusive federal jurisdiction of the same suits as 'aris[e] under' the Exchange Act pursuant to the general federal question statute." 578 U.S. —, —, 136 S. Ct. 1562, 1567 (2016) (second alteration in original) (quoting 28 U.S.C. § 1331).

Hence, we apply the same test to determine whether federal courts have exclusive jurisdiction over matters arising under the Exchange Act as we do to determine whether the district courts have original jurisdiction over suits under the general federal-question statute, 28 U.S.C. § 1331.  That test is the familiar

---

[6] If the action did not "arise under" § 27(a) of the Exchange Act, we would use an identical "arising under" test to determine whether the case presented a substantial federal question sufficient to warrant federal jurisdiction under the general federal-question statute, 28 U.S.C. § 1331(a).  Indeed, the District Court denied Turbeville's motion to remand under § 1331 and did not discuss § 27(a).  This analysis was not erroneous, as the outcome would be the same under either jurisdictional provision.

"arising under" test, which allows for federal jurisdiction in two circumstances: first, where "federal law creates the cause of action asserted"; and second, where a complaint invoking only state-law claims "'necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance' of federal and state power." *Manning*, 136 S. Ct. at 1570 (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314, 125 S. Ct. 2363, 2368 (2005)).

We begin our analysis by examining Turbeville's complaint to ascertain the nature of his challenge. Although it invokes state tort law as the basis for relief, the complaint is on its face a challenge to FINRA's application of its internal rules in exercising its regulatory authority under the Exchange Act. Three of Turbeville's four causes of action—defamation, abuse of process, and intentional interference with a prospective advantage—rest expressly on allegations that FINRA violated its own rules and exceeded its jurisdictional grant. For example, regarding defamation, Paragraph 48 of the complaint says, "FINRA's rules and regulations precluded publication of a formal charge . . . when FINRA had only a Wells notice and a response to that Wells notice." Later in the same paragraph, Turbeville says "FINRA . . . published [the Wells notice] far earlier than would normally have been the case had customary protocols been followed." The same

11

paragraph concludes, "FINRA had no jurisdiction to issue a Wells notice, investigate, or conduct any disciplinary action for the conduct."

Regarding abuse of process, Paragraph 59 alleges, "[t]he activities of FINRA and of the Does in connection with the Florida Action were outside the scope of their regulatory authority, and outside the scope of their corporate authority."  Regarding intentional interference with a prospective advantage, Paragraph 69 says,

> The publication of [the Wells notice] in this context was not only done in a manner which failed to provide a forum for Turbeville to respond, the publication was done in a manner and at a time when, under FINRA's own internal rules and regulations, no inquiry, investigation, or action could have been conducted at all and no publication should have been made public even if such actions should have been conducted.  By publishing those accusations as set forth in [the Wells notice], Turbeville's due process right to defend himself against FINRA's charges was denied even though no defense should have been necessary because FINRA was outside its authority.

Finally, while Turbeville's fourth cause of action, conspiracy, does not expressly reference FINRA's rules, the allegation incorporated all of the preceding allegations in the complaint, including the allegation that Turbeville was not "subject to the disciplinary and/or regulatory jurisdiction of FINRA for the actions alleged in [the Wells notice]."[7]

---

[7] We add that, even if Turbeville's conspiracy claim does not turn on the scope of FINRA's regulatory authority under federal law, the District Court still had authority to assert jurisdiction over that claim.  Turbeville's complaint is a classic example of shotgun pleading: each claim for relief incorporates indiscriminately all of the factual allegations set forth in the

Thus, Turbeville's complaint is fundamentally a challenge to an SRO's compliance with its internal rules while carrying out its regulatory and enforcement functions. Turbeville's claims cannot be decided without adjudging FINRA's adherence to its internal rules in investigating Turbeville and publishing the Wells notice in his BrokerCheck report. And this challenge appears on the face of the complaint: while Turbeville invokes only Florida tort law, to sustain each of his theories of recovery, he returns necessarily to his contention that FINRA violated its own internal rules and exceeded its regulatory jurisdiction.

To even begin to resolve Turbeville's claims, then, the District Court would have to interpret FINRA's internal rules to determine whether FINRA's conduct in investigating Turbeville complied with those rules. And notwithstanding those internal rules, FINRA issued the Wells notice at the heart of Turbeville's suit pursuant to its regulatory directive under the Exchange Act, which mandates that SROs publish certain information about their members. *See* 15 U.S.C. § 78o-3(i)(1)(B), (5) (requiring SROs to establish a process "to receive and promptly respond to inquiries regarding . . . registration information on its members and

---

prior claims for relief, including allegations that FINRA violated its internal rules. This is tantamount to a one-count complaint. Turbeville thus presents multiple theories of recovery—all of which hinge necessarily on the conduct of FINRA's regulators during the course of their investigation of him. Thus, each of Turbeville's claims for relief involves a "common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138 (1966). Hence, to the extent that any of his claims do not turn on resolution of a federal question—here, FINRA's regulatory conduct under federal securities law—the District Court still had supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a).

13

their associated persons" and defining "registration information" as "disciplinary actions, regulatory, judicial, and arbitration proceedings, and other information required by law, or exchange or association rule"). The District Court would have to therefore decide whether Wells notices fall within the category of information the Exchange Act requires SROs to make available to the public.

So, as the District Court observed, "[i]n order to determine Turbeville's claims that FINRA's regulatory investigation and disclosure of that investigation on a regulatory database were outside its authority and in violation of FINRA rules and regulations, the Court must necessarily interpret FINRA's rules and regulations." And because those rules and regulations are promulgated according to the Exchange Act's mandates, their interpretation unavoidably involves answering federal questions.

More importantly, Turbeville's suit does not just raise a federal question; it turns on the existence of a federally supplied right of action. Turbeville uses state-law claims to launch a collateral attack on FINRA's conduct in carrying out its disciplinary and disclosure functions under its SEC-approved rules. Were such a right of action to exist, it must have been supplied by federal law, because federal law—namely, the Exchange Act—creates SROs, vests them with a first-line role in the enforcement of federal securities law, and mandates creation of internal rules to govern their disciplinary and disclosure actions.

14

When exercising these functions, SROs act under color of federal law as deputies of the federal government.  To sue these actors, a litigant must obtain permission from the federal sovereign; otherwise, any state-law claims asserted against them for carrying out their federally mandated duties crash headlong into the shoals of preemption.  *McCulloch v. Maryland*, 4 Wheat. 316, 317 (1819) ("The states have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into effect the powers vested in the national government.").  Thus, because Turbeville's complaint depends on a right of action supplied by federal law, the District Court concluded correctly that removal was proper.  *See Manning*, 136 S. Ct. at 1569 ("Most directly, and most often, federal jurisdiction attaches when federal law creates the cause of action asserted.").

## B.

We conclude further that the District Court properly dismissed Turbeville's claim.  The District Court rightly found that Congress did not intend to create a private right of action for plaintiffs seeking to sue SROs for violations of their own internal rules.[8]  We find no support in the Exchange Act for the proposition that Congress intended to create such a right.  The Act's silence regarding the existence

---

[8] Because we hold that no private right of action exists to sue SROs for violating their internal rules, we do not address the District Court's alternative conclusion that SROs and their employees are absolutely immune from suit while exercising their regulatory functions.

of a private right of action speaks volumes, because Congress can simply say it is creating a private right of action if it wants to do so. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S. Ct. 2479, 2487 (1979) ("Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."); *see also MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 910–11 (8th Cir. 2004) (quoting the Supreme Court's decision in *Touche Ross* in finding no private right of action against FINRA's predecessor for violation of its internal rules).

In fact, the internal appeals and administrative-review processes created by the Exchange Act confirm that no private right exists. Those avenues of relief satisfy the Exchange Act's requirement that SROs "provide a fair procedure for the disciplining of members and persons associated with members," and that they "adopt rules establishing an administrative process for disputing the accuracy of information provided in response to inquiries" about affiliated persons. *See* 15 U.S.C. § 78o-3(b)(8), (i)(3).

To survive, Turbeville's collateral attack on FINRA's regulatory conduct requires picking up far more than the Exchange Act's expressly provided remedies put down. It implies necessarily the existence of a private right of action against FINRA that operates parallel to the administrative-review processes the Act prescribes. And it implies a second set of remedies—the remedies supplied by

16

state tort law. FINRA's appeals process carries its own set of remedies—to wit, reversal of the FINRA hearing board's disciplinary actions. In similar fashion, FINRA's administrative-review process for disputing information disclosed in a BrokerCheck report carries with it the remedy of removing information shown to be inaccurate. Yet despite the existence of these Exchange-Act-mandated remedies, Turbeville seeks a separate, distinct set of rights and remedies: the right to sue FINRA in state court under state tort law and recover damages as allowed therein. At the same time, he argues that no federal question exists, meaning the federal courts lack jurisdiction to adjudicate these claims. Thus, Turbeville would have us hold that a private right of action to challenge SROs—which are authorized and closely directed by federal law and federal agencies—exists under federal law, while also holding that only state courts have authority to enforce that right of action.

We are not persuaded that Congress contemplated such a result when it granted SROs regulatory authority under the Exchange Act. Recognizing the second set of rights and remedies under state law Turbeville seeks would undercut the distinctly federal nature of the Exchange Act. If actions like Turbeville's are permitted, fifty state courts would be authorized to supervise FINRA's regulatory conduct and its application of its internal, SEC-approved rules through the vehicle of state tort law. And given SROs' front-line role in enforcing federal securities

17

laws, such review would in turn lead to state-court supervision of the Exchange Act's securities-regulation regime writ large. We find nothing in the Exchange Act that suggests Congress intended to create a private right of action overlaying the relief avenue it set forth in the Act's text and thereby disrupt the uniform federal character of the securities-regulation scheme Congress created.

That these remedies leave something to be desired does not change the analysis. The Supreme Court long ago observed, "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross*, 442 U.S. at 568, 99 S. Ct. at 2485 (internal quotation marks omitted) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688, 99 S. Ct. 1946, 1953 (1979)). Although a person regulated by an SRO might find the prescribed remedies incapable of fully assuaging the reputational harm he suffered as a result of the SRO's regulatory and disciplinary conduct, he chose to accept those limitations on recovery by affiliating himself with an SRO-governed firm.

Thus, in the absence of express statutory language creating an additional right of action with additional remedies, we conclude that Congress intended these processes to be the sole venues through which FINRA-affiliated parties can challenge SROs' regulatory and enforcement conduct for compliance with their own internal rules. As a result, the District Court did not err when it found that it

18

had jurisdiction to deny remand to state court but not jurisdiction to afford relief

under a federal cause of action that does not exist.

III.

For the above reasons, the District Court's decision is AFFIRMED.