[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14415

_____

D.C. Docket No. 0:13-cv-62447-WJZ

LENWORTH BAILEY, as the Personal Representative of the
Estate of Lemar Bailey, individually and on behalf of himself
and all others similarly situated,

Plaintiff-Appellant,

versus

ROCKY MOUNTAIN HOLDINGS, LLC,
AIR METHODS CORPORATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 8, 2018)

Before TJOFLAT, JULIE CARNES, and MELLOY,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

The Airline Deregulation Act ("ADA") provides that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). This language expresses a broad preemptive intent that encompasses state enforcement actions "having a connection with or reference to airline 'rates, routes, or services.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S. Ct. 2031, 2037 (1992). Whenever a state law has "the forbidden significant effect" on the prices of an air carrier, the ADA preempts that law. *Id.* at 388, 112 S. Ct. at 2039; *see also Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1255 (11th Cir. 2003).

This case concerns whether the ADA preempts a cause of action against an air ambulance provider based on a provision of the Florida Motor Vehicle No-Fault Law, Florida Statutes §§ 627.730–627.7405. The provision is part of the No-Fault Law's requirement that automobile insurance policies provide personal injury protection ("PIP") for persons injured in automobile accidents. This protection

---

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

2

extends to "medically necessary" services, including emergency transport, "to a limit of $10,000." Fla. Stat. § 627.736(1)(a).

The PIP statute, Florida Statutes § 627.736, permits an insured to choose one of two methods for calculating the reimbursement of medical claims under his automobile insurance policy. *See Allstate Ins. Co. v. Orthopedic Specialists*, 212 So. 3d 973, 976 (Fla. 2017). The first method requires the auto insurer to reimburse "[e]ighty percent of all reasonable expenses for medically necessary . . . services." Fla. Stat. § 627.736(1)(a). To determine a reasonable amount, any "relevant" information may be considered. *Id.* § 627.736(5)(a). Under this first method, a medical provider can bill the insured for the reasonable fee that remains after his auto insurance has paid its portion.

The second method permits an insured and insurer to "limit reimbursement to 80 percent" of a schedule of charges that mostly[1] tracks Medicare rates. *Id.* § 627.736(5)(a)1. For example, an insurer may limit reimbursement for "emergency transport and treatment" to "200 percent of Medicare." *Id.* § 627.736(5)(a)1.a. But once the parties have opted to limit payment under the schedule, a provision, which we shall call the "balance billing provision," prohibits the *medical provider* from billing or attempting to bill the insured for "any amount in excess of such limits, except for amounts that are not covered by the insured's

---

[1] As to emergency hospital care, the fee schedule restricts reimbursement to "75 percent of the hospital's usual and customary charges." Fla. Stat. § 627.736(5)(a)1.c.

personal injury protection coverage due to the coinsurance amount or maximum policy limits." *Id.* § 627.736(5)(a)4.  Under this second method, a medical provider may bill the insured only for the scheduled fee, regardless of the reasonableness of that fee.

In this case, an air ambulance provider, which was registered as an air carrier under federal law, transported a child injured in an automobile accident to a hospital by helicopter.  The PIP coverage of the automobile owner's insurance policy covered the transportation.  Seeking reimbursement for the transportation, the air ambulance provider submitted a reasonable bill for medical services to the owner's auto insurer.  The owner's insurance policy limited reimbursement of the services under the fee schedule of the second method.  The auto insurer therefore paid the bill pursuant to the fee schedule, which called for a payment that was less than the reasonable amount the provider charged for its services.  The provider then charged the insured for the unpaid portion of its reasonable bill.

In an effort to avoid paying the balance of the bill, the insured brought a class action against the air ambulance provider seeking a declaration that the balance billing provision limited its reimbursement to the amount fixed in the fee schedule.  In response, the provider moved to dismiss the action on the ground that the ADA preempted the enforcement of the balance billing provision.  The insured contended in turn that the McCarran-Ferguson Act ("MFA")—which provides that

4

federal laws cannot preempt "any law enacted by any State for the purpose of regulating the business of insurance"—precluded the ADA's preemption of his action. 15 U.S.C. § 1012(b).

The District Court agreed with the air ambulance provider and held that the ADA preempted the insured's action because it related to the prices of the air carrier. The MFA, it determined, prevents only inadvertent intrusion from federal legislation, not express preemption such as that of the ADA.

The insured appeals the District Court's decision. Because his action seeks to restrict the prices of an air carrier, we hold that the ADA preempts it. The MFA does not interfere with this preemption because the balance billing provision, on which the action rests, has nothing to do with the relationship between an insurer and an insured and therefore does not regulate the business of insurance. We therefore affirm the District Court's decision.

## I.

On March 17, 2013, Lemar Bailey—the young son of the owner of the automobile insurance policy, Lenworth Bailey—suffered life-threatening injuries in an automobile accident that occurred while Deon Hyde, his stepmother, was driving.[2] Because he required immediate medical attention, Air Methods

_____

[2] Lenworth Bailey was a passenger in the vehicle at the time of the accident. Lemar Bailey received coverage under Hyde's automobile insurance policy because he was a passenger in the vehicle at the time the accident occurred. *See* Fla. Stat. § 627.736(1). For ease of

Corporation ("AMC")[3] was called upon to transport him thirty-seven miles by air ambulance from the scene of the accident to a hospital in West Palm Beach, Florida. In all, AMC operated the air ambulance between 2:30 PM and 4:04 PM, a total of one hour and thirty-four minutes. Lemar Bailey died at the hospital soon after arrival.

In exchange for its services, AMC presented a bill of $27,975.90. AMC first submitted this bill to State Farm Mutual Automobile Insurance Company, Bailey's automobile insurance provider. Pursuant to the fee schedule, State Farm paid $6,911.54 of the bill.[4] AMC billed the balance of $21,064.36 to Bailey as Lemar's father. Bailey submitted this bill to Aetna Life Insurance Company, his health insurer. Aetna paid $3,681.60 of the claim.[5] Thus, from State Farm and Aetna,

---

discussion, we refer to the insurance policy as belonging to Bailey since he and Deon Hyde were married at the time of the accident.

[3] Bailey sued Air Methods Corporation and its wholly owned subsidiary, Rocky Mountain Holdings. We refer to them collectively as AMC.

[4] The "explanation of review" provided by State Farm stated that Bailey's automobile insurance policy reimbursed the cost of air ambulance services up to "200% of the Participating Level of Medicare Part B fee schedule for the locale in which the services were rendered." For the transportation of Lemar Bailey, State Farm calculated 200% of the Medicare Part B rate to be $8,639.41. Bailey's policy also had a twenty-percent coinsurance. State Farm thus paid $6,911.54, leaving Bailey with $1,727.88 as coinsurance.

We assume that State Farm and Bailey elected to use the fee schedule to calculate the coverage of their insurance policy, since the policy must "clearly and unambiguously" contain notice that the insured and insurer have agreed to limit payment under the schedule of charges. *Geico Gen. Ins. Co. v. Virtual Imaging Servs., Inc.*, 141 So. 3d 147, 158 (Fla. 2013). The record does not contain Bailey's insurance policy with State Farm.

[5] Aetna was subrogated to Bailey's claim against the third party who caused the accident. We do not know the status of this claim.

6

AMC received $10,593.14.  Bailey did not pay the remaining balance of $17,382.76.

Bailey brought this action in the Circuit Court of Broward County, Florida, on behalf of himself and a class of individuals who received air ambulance services from AMC, alleging that AMC was attempting "to collect amounts from persons transported by air ambulance that [it was] statutorily prohibited from collecting." In his complaint, Bailey alleges that the balance billing provision forbids a medical provider from charging a PIP insured in excess of the fee schedule, when the automobile insurance agreement limited coverage to the schedule.

Bailey used two Florida statutes as vehicles for asserting his argument that the balance billing provision limits the amount AMC could charge for its services.[6] Counts II and III allege that AMC's attempt to collect the balance of the bill violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statutes § 501.204.[7]  Count IV alleges that AMC violated the Florida

---

[6] Count I seeks a declaratory judgment under Florida Statutes § 86.011, which authorizes Florida courts to "to declare rights, status, and other equitable or legal relations," alleging that AMC ran afoul of the balance billing provision by charging Bailey in excess of the fee schedule. Section 86.011 provides a remedy, not a cause of action.  *See Ready v. Safeway Rock Co.*, 24 So. 2d 808, 809 (Fla. 1946) ("[T]he Declaratory Judgments Act is nothing more than a legislative attempt to extend procedural remedies.").  We therefore consider the Count as having been incorporated into Counts II, III and IV.  In Count V, Bailey brings a claim of unjust enrichment on the ground that AMC received payment in excess of the fee schedule to which it was not entitled.

[7] Bailey alleged that AMC violated Florida Statutes § 501.204(1), which states: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  He sought a

Consumer Collections Practices Act ("FCCPA"), Florida Statutes § 559.72(9),[8] by seeking to collect an amount in excess of the fee schedule.  The balance billing provision is the gravamen of each count.  If the ADA preempts the balance billing provision, the counts fail.

AMC removed the case to the United States District Court for the Southern District of Florida under the Class Action Fairness Act ,[9] 28 U.S.C. § 1332(d)(2). Soon after removal, AMC moved to dismiss the complaint for failure to state a claim on two theories.  First, AMC argued that the balance billing provision does not preclude medical providers from billing PIP-insured patients for medical expenditures that are reasonably necessary under the circumstances *and* from collecting from the patients the portion of the bill that remains unpaid.  Second, AMC argued that the ADA preempts Bailey's action because it related to the prices of an air carrier.  49 U.S.C. § 41713(b)(1).  Bailey, in response, contended that the MFA prevents preemption of his action because the PIP statute "regulate[s] the business of insurance."  15 U.S.C. § 1012(b).

---

declaratory judgment that AMC's conduct "violate[d] this part" and wanted an injunction against further violations.  Fla. Stat. § 501.211(1).  Bailey also sought "actual damages, plus attorney's fees and court costs" on the ground that he "suffered a loss as a result of a violation of this part." *Id.* § 501.211(2).

[8] Florida Statutes § 559.72(9) provides: "In collecting consumer debts, no person shall . . . . [c]laim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert[s] the existence of some other legal right when such person knows that the right does not exist."

[9] The parties do not dispute the propriety of the removal.

8

The District Court denied AMC's motion to dismiss without explanation. AMC then answered Bailey's complaint, raising as an affirmative defense the same preemption theory it asserted in its motion to dismiss, and moved the District Court for summary judgment. Following limited discovery, Bailey moved the District Court for class certification. The District Court denied his motion.[10] Shortly thereafter, the District Court granted summary judgment for AMC, holding that the ADA preempted Bailey's action,[11] and entered judgment against Bailey.

Bailey appeals the dismissal of his action.[12] He argues that the ADA does not preempt his action because the "PIP statute does not regulate the amount that Providers can charge for aeromedical transportation." In the alternative, Bailey

---

[10] Bailey sought to certify classes under both Rule 23(b)(2) and Rule 23(b)(3).

As to the Rule 23(b)(2) class, the District Court determined that the monetary relief Bailey sought required "an individualized determination, based on the terms of each class member's insurance policy and individual exhaustion of benefits," and therefore that the monetary relief was not "incidental to requested injunctive or declaratory relief."

The District Court declined to certify the Rule 23(b)(3) class after determining that a common question of law or fact did not predominate. It reasoned that the claims presented would require an "individualized analysis [for each class member] to determine whether the debt sought from [them] was valid under [their] polic[ies]."

[11] The District Court reasoned that "each of Plaintiff's state and common law claims can only be fairly characterized as directly challenging [AMC's] rates for its air ambulance services," which rendered them preempted by the ADA. The District Court also ruled that the MFA does not defeat express preemption, such as that of the ADA.

[12] Bailey also appeals the denial of class certification. Given our disposition of the appeal, however, we need not reach that issue. *See Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1343 (11th Cir. 2000) ("With no meritorious claims, certification of those claims as a class action is moot.").

9

contends that the MFA prevents the ADA from preempting his action because the PIP statute regulates the "business of insurance."  15 U.S.C. § 1012(b).

## II.

We start with the question whether the ADA preempts Bailey's action because it challenges the rates of AMC, an air carrier.[13]  We review preemption determinations *de novo*.  *Ervast v. Flexible Prods. Co.*, 346 F.3d 1007, 1012 (11th Cir. 2003).  To begin our discussion, we trace the history of federal legislation relating to air carriers and then, drawing on Supreme Court precedent, show that Bailey's action falls squarely within the preemptive intent behind the ADA.

## A.

In 1926, Congress enacted the Air Commerce Act ("ACA"), Pub. L. No. 69-254, 44 Stat. 568 (1926), as the first comprehensive legislation on aviation.  The ACA tasked the Secretary of Commerce with developing, researching, and regulating the fledging industry of commercial aviation.[14]  *See* § 2, 44 Stat. at 569.  Congress, through the ACA, directed the Secretary of Commerce to set the basic

---

[13] The parties do not dispute AMC's status as an air carrier.

[14] The ACA directed the Secretary of Commerce to "study the possibilities for the development of air commerce and the aeronautical industry and trade in the United States and to collect and disseminate information relative thereto and also as regard the existing state of the art."  § 2(c), 44 Stat. at 569.  The Secretary was also to "investigate, record, and make public the causes of accidents in civil air navigation in the United States."  § 2(e), 44 Stat. at 569.

rules for commercial aviation.[15]  The Secretary did not, however, have the power to regulate the rates of air carriers.  Thus, in the early days of aviation, the marketplace, not the federal government, determined air carrier prices.

Congress changed course in 1938.  In that year, Congress enacted the Civil Aeronautics Act ("CAA"), Pub. L. No. 75-706, 52 Stat. 973, 980 (1938).  Among other objectives, Congress intended the CAA to promote "adequate, economical, and efficient service by air carriers at reasonable charges."  § 2(c), 52 Stat. at 980.  To this end, the CAA required air carriers to "establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges."  § 404(a), 52 Stat. at 993.  To enforce this and other provisions, the CAA created the Civil Aeronautics Authority, later reconstituted as the Civil Aeronautics Board ("CAB").[16]  The CAB was authorized to investigate, upon complaint or its own initiative, whether "any individual or joint rate, fare, or charge . . . , or any classification, rule, regulation, or practice affecting such rate, fare, or charge, . . . is or will be unjust or

---

[15] For example, the ACA required the Secretary of Commerce to create a registration and rating scheme for aircraft and airmen, to inspect air navigation facilities, to establish air traffic rules, and to provide for the issuance and expiration of aircraft registrations and airman certificates.  § 3(a)–(f), 44 Stat. 569–70.

[16] The CAA originally created a Civil Aeronautics Authority.  § 201(a), 52 Stat. 980.  The agency was renamed the Civil Aeronautics Board after Congress merged the Civil Aeronautics Authority and the Air Safety Board in 1940.  *See* 5 U.S.C. app. § 1 Reorg. Plan. IV 1940; Act of June 4, 1940, c. 231, § 4, 54 Stat. 231 (1940).  We refer to this agency as the Civil Aeronautics Board.

unreasonable."[17] § 1002(a)–(b), (d), (g), 52 Stat. at 1018–19; *see also Lichten v. E. Airlines*, 189 F.2d 939, 940–41 (2d Cir. 1951). After determining a rate or rule to be unjust or unreasonable, the CAB was required to "determine and prescribe the lawful rate, fare, or charge . . . , or the lawful classification, rule, regulation, or practice." § 1002(d), 52 Stat. at 1018.

In 1958, after two decades, Congress replaced the CAA with the Federal Aviation Act ("FAA"), Pub. L. No. 85-726, 72 Stat. 731 (1958). In language identical to the CAA, the FAA required air carriers "to establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges." § 404(a), 72 Stat. at 760. Like the CAA, the FAA also empowered the CAB to investigate whether a "rate, fare, or charge . . . , or any classification, rule, regulation, or practice affecting such rate, fare, or charge, . . . is or will be unjust or unreasonable."[18] § 1002(a)–(d), (g), 72 Stat. at 788–89. Once more, if the CAB determined a rate or rule to be unjust or unreasonable, it was obligated to "determine and prescribe the lawful rate, fare, or charge . . . , or the lawful classification, rule, regulation, or practice." § 1002(d), 72 Stat. at 789. The FAA also established factors for the CAB to consider "[i]n exercising and performing its

---

[17] The CAA also required air carriers to "file with the Authority, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it." § 403(a), 52 Stat. at 992.

[18] As before, the FAA required air carriers to "file with the Board, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation." § 403(a), 72 Stat. at 758.

powers and duties with respect to the determination of rates for the carriage of persons or property." § 1002(e), 72 Stat. at 789.[19]

In 1978, Congress eliminated the regulation of air carrier prices through the Airline Deregulation Act,  Pub. L. No. 95-504, 92 Stat. 1705 (1978).  In doing so, Congress sought to place "maximum reliance on competitive market forces and on actual and potential competition—(A) to provide the needed air transportation system, and (B) to encourage efficient and well-managed carriers to earn adequate profits and to attract capital."  49 U.S.C. § 40101(a)(6);  *see Morales*, 504 U.S. at 378–79, 112 S. Ct. at 2034.  It set the rate-making provisions of the CAA to sunset on January 1, 1983, leaving air carriers to set prices for themselves after that date.[20] § 1601(a)(2), 92 Stat. at 1744–45; *see Am. Airlines, Inc. v. Wolens*, 513 U.S. 219,

---

[19] The FAA listed the following factors as pertinent to rate-making:

(1) The effect of such rates upon the movement of traffic;

(2) The need in the public interest of adequate and efficient transportation of persons and property by air carriers at the lowest cost consistent with the furnishing of such service;

(3) Such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law;

(4) The inherent advantages of transportation by aircraft; and

(5) The need of each air carrier for revenue sufficient to enable such air carrier, under honest, economical, and efficient management, to provide adequate and efficient air carrier service.

§ 1002(e), 72 Stat. at 789.

[20] The ADA also set the CAB to sunset on January 1, 1985, to be replaced by the Department of Transportation.  § 1601(a)(4), 92 Stat. at 1745.

13

222–23, 115 S. Ct. 817, 821 (1995).  Once more, air carriers were free to set prices independent of regulation, as in the days before the CAA.

"To ensure that the States would not undo federal deregulation with regulation of their own," Congress inserted a preemption provision into the ADA. *Morales*, 504 U.S. at 378, 112 S. Ct. at 2034.  It reads as follows.

> [A] State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).  This language expresses "a broad pre-emptive purpose" and thus reaches any state statute or enforcement action that has "a connection with or reference to airline 'rates, routes, or services.'"  *Morales*, 504 U.S. at 383–84, 112 S. Ct. at 2037.  The ADA does not, however, preempt a "state-law-based court adjudication," *Wolens*, 513 U.S. at 232, 115 S. Ct. at 826, concerning a contractual obligation "voluntarily" undertaken by an air carrier, *Nw., Inc. v. Ginsberg*, 572 U.S. —, 134 S. Ct. 1422, 1432 (2014).  Therefore, an air carrier may bring a state action to enforce the terms of a contract, whether express or implied, or the person with whom an air carrier has contracted may bring a breach-of-contract action against the air carrier—so long as the action concerns voluntary commitments and not state-imposed obligations.  *Wolens*, 513 U.S. at 232–33, 237, 115 S. Ct. at 826, 828.

14

While the rates of air carriers are currently free from regulation, their practices are not.  The Department of Transportation may "investigate and decide whether an air carrier . . . has been or is engaged in an unfair or deceptive practice or an unfair method of competition."[21]  49 U.S.C. § 41712(a).  These words, "unfair" and "deceptive," were left for "case-by-case definition," *Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 306, 83 S. Ct. 476, 483 (1963), but the Supreme Court has held them to encompass "broader concepts" than the common law, *Am. Airlines v. North Am. Airlines*, 351 U.S. 79, 85, 76 S. Ct. 600, 605 (1956).  In enforcing this prohibition on unfair or deceptive practices and unfair competition, the Secretary must "ensur[e] that consumers in all regions of the United States . . . have access to affordable, regularly scheduled air service." 49 U.S.C. § 40101(a)(16).  After determining a practice to be "unfair or deceptive," the Secretary may order an air carrier to cease and desist from a practice following "notice and an opportunity for a hearing."  *Id.* § 41712(a).

---

[21] This standard, 'unfair and deceptive practices," derives from the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1).  *Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 306, 83 S. Ct. 476, 483 (1963).

The prohibition on unfair or deceptive practices in 49 U.S.C. § 41712 has been held not to create a private right of action.  *See Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 519–20 (5th Cir. 2002); *Polansky v. Trans World Airlines, Inc.*, 523 F.2d 332, 340 (3d Cir. 1975).  It is "a means of vindicating the public interest" and does not provide "a remedy for private wrongs." *Pan. Am. World Airways*, 371 U.S. at 306, 83 S. Ct. at 483.  But an "air carrier, foreign air carrier, or ticket agent" can bring a "complaint" concerning an unfair or deceptive practice before the Secretary, who may investigate if "it is in the public interest."  49 U.S.C. § 41712(a). The Secretary may also initiate investigations on its own initiative.  *Id.*

15

Therefore, while the ADA prevents the states from regulating the prices, routes, and services of air carriers, the Department of Transportation has the power to enjoin practices determined to be unfair or deceptive—words that could encompass a wide range of conduct such as the establishment of rates. *Cf. Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 219 (5th Cir. 1975) (stating that "unfair methods of competition" in 15 U.S.C. § 45 "has been interpreted to cover a broad spectrum of unauthorized trade practices, including establishment of rates and charges").

B.

This case centers on the contract price for the services AMC rendered to Bailey. On March 17, 2013, AMC provided emergency medical services to Bailey "in the expectation" of a reasonable fee and thus received a contractual right to collect that fee. *Yeats v. Moody*, 175 So. 719, 720 (Fla. 1937); *see also Nursing Care Servs., Inc. v. Dobos*, 380 So. 2d 516, 517–18 (Fla. Dist. Ct. App. 1980) (holding that a contract is implied when a person supplies emergency aid to prevent serious bodily harm or pain). Bailey seeks to invoke Florida law, namely, the balance billing provision, to reduce the concededly[22] reasonable fee of AMC.

---

[22] By failing to contest the reasonableness of AMC's fee in his complaint, Bailey inferentially admits that AMC is entitled to payment of the unpaid portion of its bill unless the balance billing provision bars it.

In the present case, Bailey sued AMC in an effort to alter the contract price by invoking the balance billing provision.  In effect, he brought suit to assert an affirmative defense against the action that he anticipated AMC would bring to collect the unpaid portion of its bill.  For purposes of analysis and discussion, we take the liberty of reversing the position of the parties.  AMC is the plaintiff. Bailey is the defendant.  AMC's complaint contains a single count, a claim for the contract price, $27,975.90, less the sums it has received, $10,593.14.  Bailey confesses that AMC has a contract right to the reasonable fee and pleads an avoidance defense that purportedly avoids that confession: the balance billing provision limits the amount of the fee.  *Cf. Haley v. Breeze*, 144 U.S. 130, 131, 12 S. Ct. 836, 837 (1892) (describing a confession and avoidance defense).  This is the case, Bailey argues, even though AMC did not have notice of the terms of his automobile insurance agreement—specifically the second method of payment— before providing services, and, in any event, could not have denied service because state law mandates that ambulance providers transport individuals in need of immediate medical attention.[23]

---

[23] In Florida, an emergency transportation provider, such as AMC, cannot deny service to a "trauma alert victim[]," Florida Statutes § 395.4045(1), a term broadly defined as "a person who has incurred a single or multisystem injury due to blunt or penetrating means or burns, who requires immediate medical intervention or treatment, and who meets one or more of the adult pediatric scorecard criteria," Florida Statutes § 395.4001(12). *See also* Fla. Stat. § 381.026(4)(d)2 ("A patient has the right to treatment for any emergency medical condition that will deteriorate from failure to provide such treatment.").  An emergency transportation provider

17

Examined through this lens, this case squeezes down into the question whether the balance billing provision, which reduces as a matter of law the contract price of medical services rendered to PIP-insured patients, relates to the prices an air carrier can charge for its services. We are without doubt on this front. The balance billing provision, a feature of the second method for calculating PIP reimbursement, has a significant effect on air carrier prices. This effect becomes clear when one examines the consequences of the first and second methods of calculating PIP reimbursement. We illustrate these consequences by walking through each method with an example.

The first method requires an auto insurer to reimburse "[e]ighty percent of all reasonable expenses for medically necessary . . . services." Fla. Stat. § 627.736(1)(a). Once auto insurance has paid, a medical provider may bill the insured for the balance of the bill. The insured may submit the bill to a secondary health insurer. If the health insurer does not cover the bill, the medical provider may seek to collect the remainder from the insured. Therefore, when an insurer and insured elect to calculate the coverage of the insurance agreement using the reasonableness standard, a medical provider has a right to reasonable compensation

---

who refuses service to a trauma alert victim is subject to civil penalties, including fines and revocation of its license to provide emergency transportation. *Id.* §§ 401.411(1)(a), 401.45(1).

18

and may charge an insured for the reasonable fee that remains after his automobile insurer has paid pursuant to the policy.

Suppose a medical provider charged an insured $30,000 for air ambulance transportation related to a car accident. Assume this fee was reasonable. The medical provider first submits the bill to the person's auto insurer. The auto insurer pays 80% of $30,000, up to the maximum policy limit of $10,000. Thus, the auto insurer pays $8,000, or 80% of $10,000. Since the auto insurer did not cover the entire balance, the medical provider could balance bill the remaining $22,000 to the insured. The insured could either pay the bill or send it to a health insurer. If not paid, the medical provider could sue the insured to collect its $22,000.

In contrast, the second method restricts the medical provider to the rate set in the fee schedule. Once an auto insurer has limited payment under the fee schedule, a medical provider is prohibited from charging the insured for any amount in excess of the fee schedule, "except for amounts that are not covered by the insured's personal injury protection coverage due to the coinsurance amount or maximum policy limits." Fla. Stat. § 627.736(5)(a)4. Thus, when an insurer and insured limit the coverage of their insurance agreement under the fee schedule, a medical provider may recover only the fee schedule amount. It does not matter

19

whether the reimbursement prescribed by the fee schedule would be considered reasonable under the circumstances.

To illustrate, suppose once more that a medical provider billed a person $30,000 for air ambulance transportation following an automobile accident—a reasonable fee. The medical provider submitted the bill to the person's auto insurer. The auto insurer limited payment under the fee schedule, which prescribed a price of $20,000, and paid 80% of the $10,000 policy maximum limit: $8,000. The balance billing provision prohibits the medical provider from billing the insured for anything other than the $2,000 coinsurance and the $10,000 of the fee schedule amount that exceeds the maximum policy limit. Therefore, because the insurer and the insured opted to calculate the reimbursement of medical claims with the fee schedule, the medical provider is limited to $20,000 for its services. The insured receives a benefit of $10,000 at the expense of the medical provider.

In conclusion, the first method permits the medical provider to recover a reasonable fee, while the second method restricts the medical provider to the fee schedule amount. Because the fee schedule tracks Medicare, which in most cases stipulates less-than-generous rates for medical services,[24] the second method

---

[24] The Secretary of Health and Human Services is required to "establish a fee schedule for payment for ambulance services whether provided directly by a supplier or provider or under arrangement with a provider." 42 U.S.C. § 1395m(l)(1). Pursuant to this provision, the Secretary has promulgated a complex formula for reimbursing ambulance services under Medicare. *See* 42 C.F.R. § 414.610. For transportation by air ambulance, the Centers for

reduces the compensation of a medical provider. The Florida Legislature has thus authorized an insured to limit the rates of a medical provider—even though the medical provider has neither received notice of nor agreed to the limitation. The insured thus has reduced exposure. He is liable for the scheduled rate instead of the reasonable fee. The medical provider takes the haircut, or, in other words, bears the loss. Given this scheme, a rational insured would always elect the second method over the first.

These examples make clear that the balance billing provision has "the forbidden significant effect" on the prices of an air carrier, here AMC. *Morales*, 504 U.S. at 384, 112 S. Ct. at 2037. AMC rendered emergency services in the expectation of a reasonable fee in return. *Yeats*, 175 So. at 720; *Dobos*, 380 So. 2d at 517–18. After the rendition of those services, Bailey sought to limit AMC's reimbursement to $8,639.41 for operating an air ambulance for an hour and thirty-four minutes with a trained pilot and medical personnel, an amount $19,336.49 less than the presumably reasonable fee. Bailey thus seeks to reduce the contract price

---

Medicare and Medicaid Services sets a base mileage rate that is adjusted based on geographic location and other factors. *Id.* § 414.610(c)(2)–(7). The rates rendered by such formulas tend to be meager because they do not account for skill or quality of care. *See* Richard Dolinar & S. Luke Leiningr, *Pay for Performance or Compliance – A Second Opinion on Medicare Reimbursement*, 3 Ind. Health L. Rev. 397, 402 (2006); *cf.* Deborah M. Naglak, *Medicare/Medicaid Reimbursement Issues – A Provider's Perspective*, 5 J.L. & Health 79, 81 (1990) ("A hospital receives a flat fee for treatment of a Medicare patient within a specific diagnostic category regardless of the cost actually incurred or services actually provided by the hospital.").

for the services rendered using the balance billing provision of the second method—a provision that the Florida Supreme Court has not yet interpreted.[25]

He attempts to impose a price restriction upon an air carrier to which the air carrier neither agreed nor could "free [itself]." *Ginsberg*, 572 U.S. at —, 134 S. Ct. at 1432.[26] An emergency provider, such as AMC, oftentimes has no notice of insurance arrangements before rendering service. Even if it did, Florida law prohibits an emergency medical provider from denying service due to a patient's ability to pay.[27] Therefore, the balance billing provision, which prohibits medical providers from charging in excess of the fee schedule amount, operates as a "state-imposed regulation" on air carrier rates. *Wolens*, 513 U.S. at 222, 115 S. Ct. at 820. The ADA preempts the application of the balance billing provision to air carriers. Because Bailey's claims invoke the balance billing provision as "a means

---

[25] The Florida Supreme Court has dealt with the schedule of charges on the issue of notice but has not interpreted the balance billing provision. *See Orthopedic Specialists*, 212 So. 3d at 979; *Virtual Imaging*, 141 So. 3d at 159–160; *see also Allstate Ins. Co. v. Holy Cross Hosp., Inc.*, 961 So. 2d 328, 335–36 (Fla. 2007). In *Virtual Imaging*, the Court lent some support to Bailey's theory when it stated that the fee schedule was "designed to regulate the amount providers could charge PIP insurers *and policyholders* for the medically necessary services PIP insurers are required to reimburse." 141 So. 3d at 153 (emphasis added).

In addition, at least one appellate court in Florida has endorsed Bailey's position in dicta. *See Green v. State Farm Mut. Auto. Ins. Co.*, 225 So. 3d 229, 231–32 (Fla. Dist. Ct. App. 2017) ("[The PIP statute] permits insurers to limit reimbursement to 80% of the maximum charges allowed by the Medicare Part B fee schedules. . . . If an insurer elects this method in its policy, the medical provider is limited to the reimbursement paid by the insurer and cannot bill the patient.").

[26] If AMC had voluntarily agreed to the fee schedule rate, the ADA would not preempt the enforcement of the fee schedule rate. *See Ginsberg*, 572 U.S. —, 134 S. Ct. at 1431–32.

[27] *See supra* note 23.

22

to guide and police" AMC's rates, the ADA preempts his action.  *Id.* at 228, 115 S. Ct. at 823.

\* \* \*

Florida law requires an emergency ambulance provider to transport individuals in need of immediate medical attention.  In return for this service, Florida law gives such providers a legal entitlement to a reasonable fee.  Through the balance billing provision, Bailey has attempted to reduce the contract price from a reasonable fee to an amount specified in a fee schedule, all because of his privately negotiated arrangements with an automobile insurance company.  The ambulance provider has no notice of such arrangements prior to rendering service. It could not deny service even if it did.

In this case, however, the ambulance provider happens to be an air carrier under federal law.  The state-imposed restriction on price thus cannot be enforced. Congress left decisions related to prices to air carriers themselves, "and not at all to States."  *Id.*  Therefore, Bailey "crash[es] headlong into the shoals of preemption." *Turbeville v. Fin. Indus. Reg. Auth.*, 874 F.3d 1268, 1276 (11th Cir. 2017).

III.

In an attempt to avoid this result, Bailey argues that the MFA reverses the ADA's preemption because the PIP statute regulates the business of insurance.[28] We disagree. In pertinent part, the MFA provides:

> No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . , unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b). Congress enacted the MFA after the Supreme Court ruled that insurance transactions were subject to federal regulation. *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 458, 89 S. Ct. 564, 567 (1969).[29] Through the MFA, Congress intended "to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation." *Nat'l Sec., Inc.*, 393 U.S. at 459, 89 S. Ct. at 568. To achieve this goal, the MFA "reverses the doctrine of preemption in cases involving state insurance laws, such that a state law regulating the business of insurance shall preempt a conflicting federal law unless that federal law specifically relates to the

---

[28] Bailey's claim that the PIP statute constitutes the business of insurance and thus falls within the reverse preemption of the MFA creates a question of statutory interpretation, which we review *de novo*. *Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209, 1220 (11th Cir. 2001).

[29] The Supreme Court held that insurance transactions fell under the Commerce Clause in *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S. Ct. 1162 (1944). Before that decision "it had been assumed, in the language of the leading case, that '[i]ssuing a policy of insurance is not a transaction of commerce.'" *Nat. Sec., Inc.*, 393 U.S. at 458, 89 S. Ct. at 567 (alterations in original) (quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183 (1869)).

24

business of insurance." *Blackfeet Nat'l Bank v. Nelson*, 171 F.3d 1237, 1244 (11th Cir. 1999). The MFA, however, "is to be narrowly construed in the face of valid federal regulatory interests." *Cochran v. Paco, Inc.*, 606 F.2d 460, 467 (5th Cir. 1979) (quotation omitted).

The MFA prevents a federal statute from preempting state law if "(1) the federal statute at issue does not 'specifically relate to the business of insurance'; (2) the state statute at issue was 'enacted for the purpose of regulating the business of insurance'; and (3) application of the federal statute would invalidate, impair, or supersede' the state statute." *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1220 (11th Cir. 2001) (alterations omitted) (quoting *Humana Inc. v. Forsyth*, 525 U.S. 299, 307, 119 S. Ct. 710, 716 (1999)). In this case, our first and only question is whether the balance billing provision regulates a practice within the "business of insurance."

The Supreme Court first addressed the phrase "business of insurance" in *SEC v. National Securities, Inc.* 393 U.S. at 460, 89 S. Ct. at 568. In that case, the Supreme Court announced that the "core" of the phrase centers on "[t]he relationship between insurer and insured, the type of policy which could be issued, and [that policy's] reliability, interpretation, and enforcement." *Id.* Relying on such principles, the Supreme Court later devised a three-part test to determine whether a state law regulates a practice that comes within the business of

25

insurance: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S. Ct. 3002, 3009 (1982) (emphasis omitted).[30] "Each of these criteria works in tandem with the others," and no single criterion "is necessarily determinative in itself." *Blackfeet*, 171 F.3d at 1246–47 (quotation omitted).

Bailey argues that the PIP statute as a whole relates to the business of insurance. But we need not decide that issue. We need only decide whether the balance billing provision relates to the business of insurance. The balance billing provision prevents a *medical provider* from charging a PIP insured for the balance of a medical bill that exceeds the amount prescribed in the fee schedule. The question is thus whether the billing and pricing practices of a medical provider constitute the business of insurance. They do not.

---

[30] We acknowledge that *Pireno* addresses the second clause of § 1012(b) that deals with antitrust immunity but we "cannot imagine that 'business of insurance' could have two different meanings in the same statutory subsection." *Blackfeet*, 171 F.3d at 1246 n.13. Indeed, in *United States Department of Treasury v. Fabe*, the Supreme Court noted that the first clause of the MFA "is not so narrowly circumscribed" as the second clause. 508 U.S. 491, 504, 113 S. Ct. 2202, 2209 (1993). Therefore, "we find it appropriate to use the *Pireno* test in making our determination" whether the balance billing of insureds falls within the business of insurance. *Blackfeet*, 171 F.3d at 1246 n.13.

26

The balance billing provision restricts how much a medical provider may charge an insured *after* his an auto insurer has paid and left the picture. It affects the billing and pricing practices of medical providers only with respect to insureds. Therefore, the practices affected by the balance billing provision have nothing to do with the "policy relationship between the insurer and insured." *Pireno*, 458 U.S. at 129, 102 S. Ct. at 3009. In addition, while the balance billing provision may spread the risk of a policyholder, that risk is spread not to insurers but to medical providers. Given these considerations, the balance billing provision cannot be said to regulate the "business of insurance."

Because the balance billing provision concerns the relationship between the insured and medical providers—not the relationship between the insurer and insured—the MFA does not reverse the ADA's preemptive effect in this case. *See Pireno*, 458 U.S. at 131–32, 102 S. Ct. at 3010 (holding that the use of a peer review committee to help set reasonable fees for chiropractic treatments did not constitute the business of insurance partly because the review committee was "not an integral part of the policy relationship between insurer and insured" and "involve[d] third parties wholly outside the insurance industry–namely, practicing chiropractors"); *Grp. Life & Health Ins. Co. v. Royal Drug. Co.*, 440 U.S. 205, 216–17, 99 S. Ct. 1067, 1075–76 (1979) (holding that "contractual arrangements" between an insurance company and pharmacies did not constitute the business of

27

insurance because they concerned a relationship with third parties and not the

relationship "between insurer and insured").

IV.

We accordingly conclude that the ADA preempts Bailey's action and

therefore that the District Court did not err in granting summary judgment.[31]

**AFFIRMED.**

---

[31] Given our disposition of this case, Count V, Bailey's unjust enrichment claim, fails to state a claim because AMC was entitled to bill a reasonable fee for its services.

In a single sentence in Count IV, Bailey alleged that AMC violated Florida Statutes § 559.72(18), which prohibits "[c]ommunicat[ing] with a debtor if the person knows that the debtor is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address." Since Bailey has not discussed this issue in his brief on appeal, he has waived it. *See Jones v. Sec'y, Dep't of Corr.*, 607 F.3d 1346, 1353–54 (11th Cir. 2010).