[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-11330

————————————————

A1A BURRITO WORKS, INC.,
a Florida corporation,

A1A BURRITO WORKS TACO SHOP 2, INC.,
a Florida corporation,

JUNIPER BEACH ENTERPRISES, INC.,
a Florida corporation, on behalf of themselves and those similarly
situated,

                                                    Plaintiffs-Appellants,

*versus*

SYSCO JACKSONVILLE, INC.,
a Delaware corporation,

                                                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:21-cv-00041-TJC-JBT

_____

Before GRANT, TJOFLAT, Circuit Judges, and HUFFAKER,[*] District Judge.

HUFFAKER, District Judge:

Plaintiffs A1A Burrito Works, Inc.; A1A Burrito Works Taco Shop 2, Inc.; and Juniper Beach Enterprises, Inc. (the Restaurants) purchase packaged poultry products from Defendant Sysco Jacksonville, Inc., for eventual resale to consumers. The Restaurants brought a putative class action alleging that Sysco violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and breached its contracts with the Restaurants when Sysco regularly delivered underweight boxes of poultry. The district court dismissed the Restaurants' claims with prejudice on the grounds that the Poultry Products Inspection Act (PPIA or the Act) preempted their state law claims. According to the district court, the Restaurants' claims impermissibly sought to impose on Sysco labeling requirements that are "in addition to, or different than" the requirements prescribed by federal law. The question for

_____

[*] Honorable R. Austin Huffaker, Jr., United States District Judge for the Middle District of Alabama, sitting by designation.

this Court is whether the Restaurants plausibly pleaded state law claims premised on Sysco's allegedly misleading labels on its poultry packages that are not preempted by federal law.

After careful review, and with the benefit of oral argument, we affirm in part, reverse in part, and remand for further proceedings. On this record, the Restaurants have not shown that the district court erred in dismissing their FDUTPA claim as preempted. But the district court did err in dismissing the Restaurants' breach of contract claim to the extent the Restaurants allege that they did not receive the amount of poultry for which they paid in accordance with their contracts with Sysco. Such a claim is not preempted because it merely seeks to enforce the parties' private agreements regarding the cost and weight of poultry packages and does not amount to a state imposing a labeling requirement inconsistent with federal regulations.

## I.

### A.

Several federal statutes regulate food products. The United States Department of Agriculture regulates egg products under the Egg Products Inspection Act, *see generally* 21 U.S.C. §§ 1031–56; meat products under the Federal Meat Inspection Act, *see generally* 21 U.S.C. §§ 601–95 (FMIA); and poultry products under

the PPIA, *see generally* 21 U.S.C. §§ 451–73.[1]  The Food and Drug Administration regulates all other food products under the Federal Food, Drug, and Cosmetic Act, *see generally* 21 U.S.C. §§ 301–399i (FDCA or FDC Act).

As relevant here, the PPIA regulates the weighing and labeling of poultry products.  *See generally* 21 U.S.C. §§ 451–73.  The Act prohibits the sale or transport of "misbranded" poultry products.  *Id.* § 458(a)(2)(A).  In turn, the term "misbranded" applies to a poultry product "if its labeling is false or misleading in any particular" or "unless it bears a label showing . . . an accurate statement of the quantity of the product in terms of weight, measure, or numerical count," with allowances for "reasonable variations" established by regulation.  *Id.* § 453(h)(1), (h)(5)(B).  The Act also contains an express preemption clause prohibiting states from imposing "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, or different than, those made under this chapter."  *Id.* § 467e.  However, the Act allows states to exercise "concurrent jurisdiction," consistent with the Act's requirements, over the inspection of poultry products for the purpose of preventing the distribution of misbranded products.  *Id.*

The Act's implementing regulations require labels to "bear a statement of the quantity of contents in terms of weights or measures."  9 C.F.R. § 381.121(a).  Like the statute, the regulations

---

[1] The parties' briefs discuss both the FMIA and the PPIA.  The district court's opinion below addressed only the PPIA.  Since the parties' dispute unquestionably concerns poultry products, our opinion focuses on the PPIA.

prohibit false or misleading labeling. *Id.* § 381.129(a) ("No poultry product subject to the Act shall have any false or misleading labeling or any container that is so made, formed, or filled as to be misleading.").

Additionally, the regulations incorporate weighing procedures contained in the National Institute of Standards and Technology (NIST) Handbook 133, Fourth Edition, January 2005 (Handbook), which is published by the United States Department of Commerce. *Id.* § 442.2. The Handbook was "developed primarily for the use of government officials" but "should also be useful to commercial and industrial establishments in the areas of packaging, distribution, and sale of commodities." U.S. Dep't of Com., Nat'l Inst. of Standards & Tech., NIST Handbook 133, Checking the Net Contents of Packaged Goods iii (4th ed., Jan. 2005).

The Handbook sets forth six basic test procedures for weighing products:

1. Identify and define the inspection lot.
2. Select the sampling plan.
3. Select the random sample.
4. Measure the net contents of the packages in the sample.
5. Evaluate compliance with the Maximum Allowable Variation MAV) requirement.
6. Evaluate compliance with the average requirement.

NIST Handbook 133, *supra*, at Ch. 2.3, page 10 (emphasis omitted).

The Handbook explains the pros and cons of testing packages among different levels of the supply chain: retail, wholesale, and point-of-pack. The Handbook explains that retail testing is "an easily accessible, practical means for State, county and city jurisdictions to monitor packaging procedures and to detect present or potential problems." *Id.* at Ch. 1.1, page 1. It cautions that retail testing generally "is not conducive to checking large quantities of individual products of any single production lot," and "[t]herefore, follow-up inspections of a particular brand or lot code number at a number of retail and wholesale outlets, and ultimately at the point-of-pack are extremely important aspects in any package-checking scheme." *Id.* at Ch. 1.1, page 1. The Handbook further notes that "[a]t the point-of-sale, a large number of processes may affect the quality or quantity of the product. Therefore, there may be many reasons for any inspection lot being out of compliance." *Id.* Examples include mishandling the product in the store, the retailer's failure to rotate stock, mishandling by a distributor, failure of some part of the packaging process, and moisture loss. *Id.* at Ch. 1.1, pages 1–2.

The Handbook also explains the purpose of random sampling and the procedures for implementing it. Random sampling "is necessary to ensure statistical validity and reliable data," and improper sampling "can lead to bias and unreliable results." *Id.* at Ch. 1.3, page 4. Random sampling "is accomplished by using

random numbers to determine which packages are chosen for inspection." *Id.*[2]

But the Handbook also states that "shortcuts" and "audit tests" may be used "to speed the process of detecting possible net content violations." NIST Handbook 133, *supra*, at Ch. 1.3, page 4. These shortcuts include "using smaller sample sizes" and "selecting samples without collecting a random sample." *Id.* The shortcuts cannot be used to take enforcement action, however.

The Handbook explains that food package content labels must meet two separate requirements to be considered "accurate." *Id.* at Ch. 1.2, page 2. First, accuracy must be "applied to the average net contents of the packages in the lot." *Id.* "The second requirement is applied to negative errors in individual packages." *Id.* Concerning the individual package requirement, the Handbook states: "[P]ackages that are underfilled by more than the Maximum Allowable Variation specified for the package are considered unreasonable errors. Unreasonable shortages are not generally permitted, even when overages in other packages in the

---

[2] The Handbook sets forth a detailed package selection procedure using random numbers, which includes: (1) identifying each package in the lot of packages with a specific number; and (2) obtaining a series of random numbers, which indicate exactly which packages in the lot will be taken for the sample. *Id.* at app. B, page B-1. To select a random starting place on the series of random numbers, the Handbook instructs to "choose a starting page in the random number table and with eyes closed, drop a pencil anywhere on the page to indicate a starting place in the table." *Id.*

same lot, shipment or delivery compensate for such shortage." *Id.* at 2–3.

### B.

The Restaurants routinely order packaged food products, including poultry products, from Sysco pursuant to contracts called Distribution Agreements. A copy of A1A Burrito Works' Distribution Agreement with Sysco is attached to the second amended complaint (Distribution Agreement). The Distribution Agreement sets forth, among other things, pricing and delivery terms. As relevant here, it provides that pricing is determined based on a fee per pound.[3] The Distribution Agreement also contains Sysco's warranty that its products will "not be adulterated or misbranded within the meaning of the FDC Act" (i.e., not falsely or misleadingly labeled).

In their second amended complaint (the operative complaint), the Restaurants allege that their contracts with Sysco call for pricing to be determined based on a fee per pound. They also allege that on thirteen separate occasions over an approximately one-year period, they ordered and paid for 40-pound boxes of poultry but received less than 40 pounds. Each package was labeled, and the Restaurants were charged for, 40 pounds, but each package weighed less, ranging from 34.7 pounds

---

[3] For the sake of clarity, record citations are based on the CM/ECF document page and paragraph numbers.

(resulting in an overcharge of 5.3 pounds) to 37.3 pounds (resulting in an overcharge of 2.7 pounds).

The Restaurants allege that in weighing the poultry packages received from Sysco, they "undertook a good-faith, commercially reasonable weighing process consistent in all material aspects with NIST Handbook 133," and that the process "considered the maximum and minimum allowable variations of weight for the type of Packaged Food, whether the product was frozen or thawed, and the tare weight."

The Restaurants further allege that in August 2021, the Florida Department of Agriculture and Consumer Services inspected Sysco poultry packages at two of A1A Burrito Works' locations. The state inspectors inspected multiple packages that were advertised and sold as weighing 40 pounds, but each package was underweight.

The Restaurants filed a putative class action in state court against Sysco, asserting claims for breach of contract under Florida law and violation of the FDUTPA, FLA. STAT. § 501.201 *et seq.* Sysco removed the case to federal court and filed a motion to dismiss. The Restaurants sought and obtained permission to amend their complaint twice.

In the operative complaint, the Restaurants allege that Sysco systematically delivered underweight poultry packages to its restaurant customers. Consequently, according to the Restaurants, the labels on the poultry packages were misleading

concerning weight in violation of the FDUTPA. Concerning the breach of contract claim, the Restaurants allege that they had entered into Distribution Agreements with Sysco that provided for pricing to be based on a fee per pound and in which Sysco warranted that its products (1) "will meet the written specifications provided by Sysco" and (2) "will not be adulterated or misbranded within the meaning of the FDC Act." The Restaurants further allege that "despite being charged based on specified advertised weights, Sysco delivered lower weights while simultaneously charging for higher weights." Thus, according to the Restaurants, Sysco breached its contracts with them and other class members when it charged and collected payment for "contractually agreed-upon" 40-pound poultry packages while delivering packages weighing less. The Restaurants claim damages "consisting of the difference in price between what was purchased and what should have been delivered."

Sysco moved to dismiss the second amended complaint, raising several grounds for dismissal or narrowing of the issues, including that the Restaurants' claims were preempted by the PPIA. The district judge referred the motion to the magistrate judge, and the magistrate judge recommended that the second amended complaint be dismissed with prejudice, addressing only Sysco's preemption argument. The magistrate judge concluded that the Restaurants' claims were preempted because they would impose different standards for testing the net weight of Sysco's boxes of poultry than the standards prescribed by federal law. The

magistrate judge reasoned that the second amended complaint demonstrated that the Restaurants' weighing procedures are "materially different" than the federal procedures governing Sysco because, for example, the Restaurants "did not follow, or followed different, requirements regarding inspection lots, random sampling, and evaluating average net weight." Citing cases from the United States Court of Appeals for the Ninth Circuit, the magistrate judge opined that to avoid preemption, the Restaurants "must plausibly allege that the process they used in testing [Sysco's] compliance with its net weight label statement is the same as that governing [Sysco]."

The magistrate judge characterized as vague and conclusory the Restaurants' allegation that they undertook a good-faith, commercially reasonable weighing process consistent in all materials aspects with the Handbook. The magistrate judge also criticized the second amended complaint for not indicating the "total number of packages received from [Sysco] during the relevant time period, how the underweight packages were selected from that total for testing (whether there was a random sample taken from a defined inspection lot), or that [the Restaurants] obtained average weights of multiple packages." The magistrate judge rejected the Restaurants' position that, "from the limited sample of underweight packages at the retail level," the court could "reasonably infer that [Sysco's] wholesale process is somehow flawed or suspect, and thus, [Sysco] is liable for misleading labeling."

The magistrate judge also observed that the PPIA does not necessarily preempt a breach of contract claim because Sysco "may have voluntarily taken on additional obligations by contract." But according to the magistrate judge, the contract terms at issue "expressly invoke the same federal requirements that determine preemption," citing the second amended complaint's allegation and the Distribution Agreement's provision that "Sysco represents and warrants that all Products . . . will not be adulterated or misbranded within the meaning of the [Federal Food, Drug, and Cosmetic Act]." Thus, according to the magistrate judge, the preemption analysis for the FDUTPA and breach of contact claims is the same—the Restaurants "must plausibly allege that [Sysco's] labels are misleading as defined by federal law"—but the Restaurants had not done so. The magistrate judge did not discuss the second amended complaint's allegations that the parties' contract calls for pricing to be determined based on a fee per pound and "despite being charged based on specified advertised weights, Sysco delivered lower weights while simultaneously charging for higher weights."

The district judge adopted the report and recommendation, granted Sysco's motion, and dismissed the Restaurants' second amended complaint with prejudice. The Restaurants timely appealed.

## II.

"We review preemption determinations de novo." *Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 847 (11th Cir. 2022)

(per curiam) (quoting *Bailey v. Rocky Mountain Holdings, LLC*, 889 F.3d 1259, 1266 (11th Cir. 2018)).  And we review a district court's ruling on a motion to dismiss de novo, accepting the complaint's factual allegations as true and construing them in the light most favorable to the nonmovants.  *Id.*

### III.

#### A.

The Restaurants argue that, at a minimum, their breach of contract claim is not preempted.  They assert that, despite acknowledging that "customers may seek greater contractual protections that do not rely on federal standards for mislabeling," the district court nonetheless improperly conflated their FDUTPA and breach of contract claims and failed to separately analyze their independent breach of contract claim—that Sysco failed to deliver the products contracted and paid for.  The Restaurants explain that their contracts with Sysco provided for pricing to be based on a fee per pound, and despite being charged for specified weights, Sysco "delivered different and lower weights while charging for higher weights."  Thus, according to the Restaurants, Sysco breached its contracts with them "by not delivering contractually agreed-upon weights for which the Restaurants paid as per the contract."  Sysco does not respond to this argument, instead focusing on the operative complaint's allegations that Sysco violated the FDC Act-related warranty.

We have not yet addressed breach of contract claims in the context of PPIA preemption.  But in the context of other federal statutes, both this Court and the United States Supreme Court have held that breach of contract claims seeking to enforce a defendant's voluntary undertaking are not preempted because such claims do not amount to a state imposing a requirement inconsistent with federal regulations.  For example, we have found breach of contract claims against airlines concerning pricing not to be preempted by the Airline Deregulation Act (ADA), even though the ADA prohibits state regulation of airline pricing.[4] *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995) ("We hold that the ADA's preemption prescription bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves."); *Cavalieri*, 25 F.4th at 846 ("Plaintiffs' breach of contract claim seeks merely to enforce the parties' private agreements regarding the cost of passage and does not invoke state laws or regulations to alter the agreed-upon price.").

In *Cavalieri*, the plaintiffs alleged that they had purchased commercial airline tickets from the defendant airline, entering into a contract whose terms are reflected in the airline's "Contract of Carriage and the issued tickets." 25 F.4th at 846.  According to the

---

[4] Unlike the PPIA, which prohibits states from imposing labeling or packaging requirements "in addition to, or different than" federal requirements, 21 U.S.C. § 467e, the ADA prohibits states from imposing *any* law or regulation related to an air carrier's pricing, *see* 49 U.S.C. § 41713(b)(1).

plaintiffs, the ticket price included all taxes and fees. *Id.* However, the airline later told the plaintiffs that they "had to pay an additional $80 'Exit Fee' before being allowed to board their flights." *Id.* The district court dismissed the plaintiffs' putative class action complaint on the grounds that the breach of contract claim was preempted by the ADA. *Id.* at 847. The plaintiffs appealed, and we reversed. *Id.* at 854. In rejecting preemption's applicability, we explained how the plaintiffs alleged that the airline had agreed to transport them to their destination for the ticketed price, "inclusive of all fees and taxes," and the airline allegedly breached that agreement by charging an additional Exit Fee. *Id.* at 851. We thus concluded that the plaintiffs' claim "seeks recovery solely for the alleged breach of [the airline's] own, self-imposed undertaking regarding the price charged for transport." *Id.*

Additionally, in *Bates v. Dow Agrosciences LLC*, the Supreme Court held that an express warranty claim was not preempted by another federal labeling statute—the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)—even though the express warranty was located on the product's label, explaining that "a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." 544 U.S. 431, 444 (2005). The plaintiffs in *Bates* sued the manufacturer of Strongarm, a weed killer used on peanut crops, over a label on the product. *Id.* at 434–36. The label stated: "Use of Strongarm is recommended in all areas where peanuts are

grown." *Id.* at 435. The plaintiffs alleged that the manufacturer knew or should have known that Strongarm would stunt peanut growth in soils with pH levels of 7.0 or greater, and that when the plaintiffs used Strongarm on their farms, whose soils have pH levels of 7.2 or higher, Strongarm damaged their peanut crops and failed to control the growth of weeds. *Id.* The plaintiffs brought an express warranty claim under Texas law concerning the label's "warranty" that the product's use was recommended "in all areas where peanuts are grown." *Id.* at 435–36.

FIFRA's preemption provision prohibits states from "impos[ing] or continu[ing] in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b).[5] The Fifth Circuit Court of Appeals affirmed the district court's dismissal on preemption grounds, interpreting § 136v(b) to preempt any state law claim in which "a judgment against [the manufacturer] would induce it to alter its product label." *Bates*, 544 U.S. at 436 (citation omitted).

The Supreme Court concluded that the plaintiffs' express warranty claim was not preempted. *Id.* at 444. The Court observed that common-law rules requiring manufacturers "to honor their express warranties *or other contractual commitments*

---

[5] This language is comparable to the PPIA's preemption provision, which prohibits states from imposing labeling or packaging requirements "in addition to, or different than, those made under this chapter," 21 U.S.C. § 467e.

plainly do not qualify as requirements for 'labeling or packaging,'" explaining that such rules do not require manufacturers to "label or package their products in any particular way." *Id.* (emphasis added). The Court acknowledged that the manufacturer's express warranty was located on the product's label but reasoned that an express warranty claim "asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." *Id.* And "[b]ecause this common-law rule does not require the manufacturer to make an express warranty, or in the event that the manufacturer elects to do so, to say anything in particular in that warranty, the rule does not impose a requirement 'for labeling or packaging.'" *Id.* at 444–45.

Citing *Bates*, at least one district court in this circuit has observed that the PPIA generally would not preempt an express warranty claim "because an express warranty claim merely holds the defendant responsible for delivering the product as warranted." *Kuenzig v. Kraft Foods, Inc.*, No. 8:11-cv-838-T-24 TGW, 2011 WL 4031141, at \*7 (M.D. Fla. Sept. 12, 2011) (citing *Bates*, 544 U.S. at 431).

The Restaurants argue that their independent breach of contract claim—that they have a contract with Sysco under which they seek relief for Sysco's alleged failure to deliver what was contracted and paid for—is not preempted because Sysco voluntarily undertook obligations to deliver contractually agreed-upon weights at contractually agreed-upon prices. We agree. The

Restaurants pleaded a breach of contract claim seeking merely to enforce the parties' voluntary agreement regarding pricing and weight, and it does not depend on federal labeling or packaging standards. *Cf. Cavalieri*, 25 F.4th at 846. The Restaurants allege that Sysco agreed for the pricing of packaged poultry to be based on a fee per pound, and that Sysco breached that agreement by charging the Restaurants for packages containing 40 pounds while delivering packages containing less. Thus, similar to the express warranty claim in *Bates* and the breach of contract claim in *Cavalieri*, the Restaurants' claim asks only that Sysco honor the contractual obligations regarding prices and weights of packaged poultry that Sysco voluntarily undertook when it entered into Distribution Agreements with the Restaurants. *See Bates*, 544 U.S. at 444; *Cavalieri*, 25 F.4th at 851. A common-law rule requiring Sysco to honor its contractual commitments "plainly do[es] not qualify as [a] requirement[] for 'labeling or packaging'" because such a rule does not require Sysco to label or package its poultry products "in any particular way." *See Bates*, 544 U.S. at 444. Because the Restaurants' breach of contract claim does not impose any labeling or packaging requirement on Sysco, the PPIA does not preempt it. *See id.*

Sysco's alleged obligation to deliver the amount of packaged poultry for which the Restaurants were charged and for which they paid, and not some lesser amount, is a self-imposed undertaking, the alleged breach of which gives rise to a cause of action that the PPIA does not preempt. In focusing exclusively on the Rest-

aurants' allegation and the contract provision concerning the FDC Act, the district court overlooked the more straightforward breach of contract claim that was pleaded in the operative complaint. Thus, we conclude that the district court erred in dismissing the Restaurants' breach of contract claim.

## B.

The Restaurants also argue that the district court erred in dismissing their FDUTPA claim as preempted. They argue that the Handbook was designed to assist government employees conducting compliance testing and did not create a pleading standard for businesses seeking to bring claims concerning mislabeled products. They further contend that it is impossible for businesses to strictly comply with all of the Handbook's weighing procedures prior to filing a lawsuit.

The district court reasoned that to avoid preemption, the Restaurants "must plausibly allege that the process they used in testing [Sysco's] compliance with its net weight label statement is the same as that governing [Sysco]." On appeal, Sysco distances itself somewhat from this position, and it insists we need not hold that the Restaurants were required to "follow every jot and tittle" of the Handbook's weighing procedures. Instead, according to Sysco, we may affirm the district court on the grounds that the procedures allegedly used by the Restaurants are so materially different from the federal procedures that the second amended

complaint fails to plausibly allege that Sysco violated federal law, thereby rendering the Restaurants' claims preempted.

For a state requirement to be preempted by the PPIA, it must satisfy two conditions: (1) it must be a requirement for "labeling" or "packaging," and (2) it must impose a labeling or packaging requirement that is "in addition to, or different than, those made under" the PPIA. *See* 21 U.S.C. § 467e; *see also Bates*, 544 U.S. at 444 (analyzing FIFRA's preemption provision).

If Sysco's poultry packages are not underweight when evaluated according to federal regulations, any state law claim that the packages are nonetheless underweight—and thus the label misleading—is preempted because it would impermissibly impose weight—and thus labeling—requirements on Sysco that are "in addition to, or different than" those imposed by federal law. Thus, while we do not agree fully with the district court's reasoning,[6] we agree with the district court insofar as it concluded that the

---

[6] We disagree with the district court to the extent it concluded that the Restaurants failed to adequately allege random sampling, in light of the Handbook's permitting "[s]hortcuts . . . to speed the process of detecting possible net content violations, including "selecting samples without collecting a random sample." *See* NIST Handbook 133, *supra*, at Ch. 1.3, page 4. Additionally, we disagree with the district court to the extent it concluded that the Restaurants failed to adequately allege testing beyond the retail level, given that the Handbook lauds retail-level testing as an "easily accessible, practical means for State, county and city jurisdictions to monitor packaging procedures and to detect present or potential problems." *See id.* at Ch. 1.1, page 1.

Restaurants had to allege sufficient facts to permit the reasonable inference that Sysco delivered packaged poultry that was underweight by federal standards.

After carefully considering the Restaurants' arguments raised in their opening brief on appeal, the Restaurants have not persuaded us that the district court erred in concluding that they failed to plausibly allege the poultry packages were underweight by federal standards. The district court identified multiple purported deficiencies in the operative complaint that, according to the district court, operated as barriers to the plausibility of the Restaurants' claim, including the Restaurants' failure to allege the total number of poultry packages received from Sysco during the relevant period or the packages' average weights—information known or knowable to the Restaurants. But the Restaurants do not explain, let alone persuasively so, why their claim is plausible (and not preempted) notwithstanding these deficiencies, particularly the Handbook's admonition that accuracy of content labels must be "applied to the average net contents of the packages in the lot," NIST Handbook 133, *supra*, at Ch. 1.2, page 2.

In their reply brief, the Restaurants argued that they established that Sysco's poultry packages "exceeded the applicable MAV," citing as an example the second amended complaint's allegation that on one occasion, one of the Restaurants received a package weighing approximately 35.4 pounds, "resulting in an overcharge of 4.6 pounds—a stunning 11.5% of the total order." And at oral argument, the Restaurants argued that "all [they] [had]

to plead is that these individual packages were beyond the Maximum Allowable Variation, MAV," an argument that was also advanced by the Amicus. However, neither of these arguments appears in the Restaurants' opening brief.

"[W]e do not consider arguments 'not raised in a party's initial brief and made for the first time at oral argument.'" *Holland v. Gee*, 677 F.3d 1047, 1066 (11th Cir. 2012) (quoting *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1269 (11th Cir. 2007)). "Issues not raised in an initial brief are deemed forfeited and will not be addressed absent extraordinary circumstances." *Anthony v. Georgia*, 69 F.4th 796, 807 (11th Cir. 2023) (citing *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir.) (en banc), *cert. denied*, 143 S. Ct. 95 (2022)). Extraordinary circumstances may exist when:

> (1) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (2) the party lacked an opportunity to raise the issue at the district court level; (3) the interest of substantial justice is at stake; (4) the proper resolution is beyond any doubt; or (5) the issue presents significant questions of general impact or of great public concern.

*Campbell*, 26 F.4th at 873. If we conclude that one of these circumstances applies, we must "then decide whether the issue is

extraordinary enough for us to exercise our discretion and excuse the forfeiture." *Id.* at 875.

The Restaurants' MAV arguments appear compelling. According to the Handbook, food package content labels must meet two separate requirements to be considered "accurate." NIST Handbook 133, *supra*, at Ch. 1.2, page 2. First, accuracy must be "applied to the average net contents of the packages in the lot." *Id.* "The second requirement is applied to negative errors in individual packages." *Id.* The Handbook further states that "[t]hese requirements apply simultaneously to the inspection of all lots of packages except as specified in 'Exceptions to the Average and Individual Package Requirements,'" which are not applicable here. *Id.* Concerning the individual package requirement, the Handbook states: "[P]ackages that are underfilled by more than the Maximum Allowable Variation specified for the package are considered unreasonable errors. Unreasonable shortages are not generally permitted, even when overages in other packages in the same lot, shipment or delivery compensate for such shortage." *Id.* at 2–3.

For 40-pound boxes of poultry, the MAV is 1% of the labeled weight, or 0.4 pounds. *Id.* at tbl. 2-9, page A-11. And the applicable sampling plans allow only a small number of packages to be underweight beyond the MAV. The Handbook does not allow for *any* packages to be underweight beyond the MAV until the lot size exceeds 3,200 and the sample size is 48. *Id.* at tbl. 2-1, page A-2.

Even then, the lot fails if more than one package is underweight beyond the MAV. *Id.*

Unfortunately for the Restaurants, however, they forfeited any argument that they only had to allege that individual packages are underweight by more than the MAV because they did not raise it in their opening brief. Their opening brief contains a single reference to the MAV: a quote of the second amended complaint's allegation that their weighing process "considered the maximum . . . allowable variations of weight for the type of Packaged Food." Although "briefs should be read liberally to ascertain the issues raised on appeal," *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1200 (11th Cir. 2019) (quoting *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)), a liberal reading of the Restaurants' opening brief does not transform their passing reference to the MAV into an argument that they can avoid preemption solely with MAV-based allegations. And although the Restaurants' belated argument may appear compelling, we lack the benefit of full briefing by both sides addressing the meaning of the Handbook's MAV-related provisions. And adherence to the party presentation principle is one important reason why we generally decline to decide issues not (timely) raised on appeal. *See Campbell*, 26 F.4th at 872; *id.* at 893–94, 897 (Newsom and Jordan, J.J., dissenting).

Additionally, no exceptional circumstances apply here, "because a refusal to consider the issue would not result in a miscarriage of justice, the issue is not one of substantial justice, the

proper resolution is not beyond any doubt, and the issue does not present significant questions of general impact or of great public concern." *See Anthony*, 69 F.4th at 808 (citing *Campbell*, 26 F.4th at 873). Moreover, the issue is not "extraordinary enough for us to exercise our discretion and excuse the forfeiture." *See Campbell*, 26 F.4th at 875. Consequently, on this record, the Restaurants have failed to show that the district court erred in dismissing their FDUTPA claim as preempted.

## IV.

For the foregoing reasons, we **AFFIRM** the dismissal of the FDUTPA claim, **REVERSE** the dismissal of the breach of contract claim, and **REMAND** for further proceedings.